No. 22-15231

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FLEXTRONICS INTERNATIONAL USA, INC.,

*Plaintiff-Appellant,*

*v.*

PANASONIC CORPORATION ET AL.,

*Defendant-Appellee.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA DISTRICT COURT NO. 5:19-cv-00078-EJD*

## APPELLANT'S OPENING BRIEF

JOSEPH JAMES POPPEN
Bryan Cave Leighton Paisner LLP
Three Embarcadero Center
7th Floor
San Francisco, CA 94111
Tel. (415) 675-3470

ASHLEY HYUN-JEONG KIM
EVAN BOYLE
Bryan Cave Leighton Paisner LLP
161 N Clark Street
Suite 4300
Chicago, IL 60601
Tel. (312) 602-5000

CHARLES E. TOMPKINS
Bryan Cave Leighton Paisner LLP
1155 F Street, NW, Suite 700
Washington, DC 20004
charles.tompkins@bclplaw.com
Tel. (202) 508-6055

Attorneys for Plaintiff-Appellant
FLEXTRONICS INTERNATIONAL
USA, INC.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant Flextronics International USA, Inc., states as follows:

Plaintiff-Appellant Flextronics International USA, Inc., is not a publicly held corporation or publicly held entity. Flextronics International USA, Inc. is 100% held by Flextronics International Holding LLC, which is 100% held by Flextronics Corporation, which is 100% held by Flextronics Holdings Technologies Luxembourg S.à.r.l. (FKA Vista Point Technologies (Lux) S.à.r.l.), which is 100% owned by Flextronics International Ltd. Other than as referenced herein, no other publicly held corporation or other publicly held entity owns 10% of the stock of a party. No other publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation.

Dated: June 27, 2022

Bryan Cave Leighton Paisner LLP

*/s/ Charles E. Tompkins*

CHARLES E. TOMPKINS
Attorneys for Plaintiff-Appellant
FLEXTRONICS INTERNATIONAL USA,
INC.

ii

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................6

STATEMENT OF THE ISSUES.............................................................6

STATEMENT OF THE CASE .................................................................7

I.      Nature of the Case ........................................................................7

II.     Statement of Relevant Procedural Background ............................7

        A.  The Direct Purchaser Class Case ......................................7

        B.  Flex's Individual Case.......................................................8

        C.  The Disposition Below......................................................11

STATEMENT OF FACTS .....................................................................13

I.      Summary of Liability-Related Facts...........................................13

II.     Inductors and the Passive Components Market. .........................16

III.    Plaintiff Flextronics International USA, Inc.................................19

        A.  Flex's Inductor Procurement. ..........................................19

        B.  Flex's Investigation of the Allegations in the Operative
            Complaint. ........................................................................20

IV.     The Defendants .............................................................................21

        A.  JEITA ..............................................................................22

V.      The Alleged Conspiracy ..............................................................23

A.   Defendants Exchanged Detailed Individual Price and Production Forecasts that Permitted Defendants to Monitor and Enforce the Conspiracy. ............................................................. 23

B.   Defendants Used The Information Exchanged to Monitor and Enforce Anticompetitive Agreements and Artificially Inflate Inductor Prices. .............................................................. 26

C.   JEITA Members Acknowledged that the Meetings Were Unlawful or a Compliance Violation .............................................. 28

D.   Defendants Agreed On a Common Formula for Calculating Publicly-Reported Average Per Unit Inductor Prices. .................. 29

E.   Defendants' Exchanges of Information And Collusive Discussions Were More Consistent With Concerted Than Individual Action ............................................................. 30

F.   Inductor Market Conditions Were Conducive to Conspiracy. 34

G.   Defendants' Prices Were Parallel. .......................................... 35

SUMMARY OF THE ARGUMENT ....................................................... 36

ARGUMENT ...................................................................................... 39

I.   The District Court Misapplied This Circuit's Pleading Standards. ..................................................................... 39

A.   Flex Was Merely Required to Plausibly Allege A Conspiracy to Pursue Its Section 1 Sherman Act Claim. ..................................... 39

B.   The District Court Erred by Deeming Flex's Allegations of Circumstantial Evidence Irrelevant Absent Allegations of Parallel Conduct ......................................................................... 41

C.   Flex Plausibly Alleged that Appellees Conspired in Violation of Section 1. ........................................................................... 46

     1.   Flex provided Defendant-Specific Allegations ................... 46

2.  Defendants' Conduct at JEITA Trade Association Meetings Plausibly Suggests a Conspiracy.................................... 48

    a.  Defendants' Information Exchanges Plausibly Support a Conspiracy. .......................................................... 50

    b.  Defendants' Discussions and Coordinated Pricing at JEITA Meetings Plausibly Support a Conspiracy. ............... 53

D.  Even if Parallel Conduct is Required, Flex Adequately Alleged Parallel Conduct in Two Forms. .................................... 55

    1.  Defendants' Secret Exchanges of Current and Future Price and Production Information Were Parallel Conduct. ............... 55

    2.  The District Court Erred By Rejecting Flex's Parallel Pricing Allegations................................................... 57

E.  The Court Did Not Holistically Consider New Allegations in the Operative Complaint................................................. 63

CONCLUSION ............................................................ 66

REQUEST FOR ORAL ARGUMENT ..................................... 68

STATEMENT OF RELATED CASES ..................................... 69

CERTIFICATE OF COMPLIANCE...................................... 70

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Aftermarket Auto. Lighting Prods. Antitrust Litigation,*
 No. 2:09-md-02007-GW (C.D. Cal.) ....................................................31

*Allan v. Realcomp II, Ltd, et al.,*
 No. 2:10-cv-14046 (E.D. Mich.) ..........................................................31

*Am. Column & Lumber Co. v. United States,*
 257 U.S. 377 (1921) .............................................................................51

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) .............................................................................40

*ASW v. Oregon,*
 424 F.3d 970 (9th Cir. 2005) ...............................................................39

*Bell Atlantic Corp. v. Twombly,*
 550 U.S. 544 (2007) .................................................................... *passim*

*Blair Foods, Inc. v. Ranchers Cotton Oil,*
 610 F.2d 665 (9th Cir. 1980) ...............................................................46

*Bona Fide Conglomerate, Inc. v. SourceAmerica,*
 691 F. App'x 389 (9th Cir. 2017) .........................................................45

*In re Capacitors Antitrust Litig.,*
 106 F. Supp. 3d 1051 (N.D. Cal. 2015) ...............................................42

*In re Capacitors Antitrust Litigation,*
 154 F. Supp. 3d 918 (N.D. Cal. 2015) .................................................41

*In re Capacitors,*
 No. 14-cv-03264-JD (N.D. Cal. May 31, 2019) ....................................2

*Cason-Merenda v. Detroit Med. Ctr.,*
 862 F. Supp. 2d 603 (E.D. Mich. 2012) ..............................................42

*In re Citric Acid Litig.,*
 191 F.3d 1090 (9th Cir. 1999) .........................................42–43, 49–50

vi

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) .................................................................. 40–41

*Costa v. Desert Palace, Inc.*,
   299 F.3d 838 (9th Cir. 2002) ..................................................... 46

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) ............................................. 61

*In re Domestic Drywall Antitrust Litigation*,
   No. 2:13-md-02437 (E.D. Pa.) .................................................... 31

*In re Dynamic Random Access Memory (DRAM) Indirect
   Purchaser Antitrust Litig.*,
   28 F.4th 42 (9th Cir. 2022) .............................. 45, 55–56, 66

*Erickson v. Pardus*,
   551 U.S. 89 (2007) ..................................................................... 40

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) ................................. 50, 64

*Fleischman v. Albany Med. Ctr.*,
   728 F. Supp. 2d 130 (S.D.N.Y. 2010) ...................................... 43

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,
   No. 2:09-cv-00852 (E.D. Wash.) ................................................ 31

*In re Generic Pharms. Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) ........................................ 62

*In re HighTech Emp. Antitrust Litig.*,
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..................................... 40

*Hogan v. Cleveland Ave Rest. Inc.*,
   No. 2:15-CV-2883, 2018 WL 1475398 (S.D. Ohio Mar. 26,
   2018) ........................................................................................... 42

*Krieg v. Mills*,
   117 F. Supp. 2d 964 (N.D. Cal. 2000), *aff'd*, 8 F. App'x 663
   (9th Cir. 2001) (unpublished) ................................................... 65

*In re Loc. TV Advert. Antitrust Litig.*,
No. 18 C 6785, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020)................ 62

*In re Mercedes-Benz Anti-Trust Litig.*,
157 F. Supp. 2d 355 (D.N.J. 2001)......................................................51

*In re Mexican Gov't Bonds Antitrust Litig.*,
412 F. Supp. 3d 380 (S.D.N.Y. 2019)..................................................62

*Miami Prod. & Chem. Co. v. Olin Corp.*,
449 F. Supp. 3d 136 (W.D.N.Y. 2020)................................................51

*Mudpie Inc. v. Travelers Cas. Ins. Co. of Am.*,
15 F.4th 885 (9th Cir. 2021) ...............................................................39

*In re Musical Instruments and Equipment Antitrust
Litigation*,
798 F.3d 1186 (9th Cir. 2015)..................................................... *passim*

*Nicholson v. Fitzgerald Auto Mall*,
No. Civil Action No. RDB-13-3711, 2014 WL 2124654 (D.
Md. May 20, 2014) ..............................................................................59

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ............................................................59

*O'Connor v. Boeing N. Am., Inc.*,
No. CV 97-1554 DT, 2004 WL 5519343 (C.D. Cal. Sep. 13,
2004)......................................................................................................59

*Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*,
998 F.2d 1224 (3d Cir. 1993) .............................................................61

*Poller v. Columbia Broadcasting Systems, Inc.*,
368 U.S. 464 (1962)............................................................................46

*In re Polyurethane Foam Antitrust Litigation*,
No. 1:10-md-02196 (N.D. Ohio) .........................................................31

*In re Puerto Rican Cabotage Antitrust Litigation*,
No. 3:08-md-01960 (D.P.R.) ...............................................................31

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  587 F. Supp. 2d 27 (D.D.C. 2008) .................................................. 40–41

*In re Resistors Antitrust Litig.*,
  15-cv-03820-JD (N.D. Cal. Oct. 11, 2019) ........................................... 2

*In re Resistors Antitrust Litig*,
  No. 15-CV-03820-JD, 2017 WL 3895706 (N.D. Cal. Sept.
  5, 2017) ...................................................................................... 42, 63

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ............................................................... 61

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
  803 F.3d 1084 (9th Cir. 2015) ............................................................ 43

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ......................................... 50, 51

*Tan v. GrubHub, Inc.*,
  171 F. Supp. 3d 998 (N.D. Cal. 2016) ................................................ 65

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) .............................................................. 52

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ........................................ 46–47

*In re Titanium Dioxide Antitrust Litigation*,
  No. 10-cv-00318-RDB (D. Md.) .......................................................... 31

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) .............................................................. 51

*United States v. Asawa, et al.*,
  No. 4-15-cr-00163-JD, ECF No. 15 (N.D. Cal.) ................................. 18

*United States v. Container Corp. of Am.*,
  393 U.S. 333 (1969) ...................................................................... 51, 52

*United States v. Falstaff Brewing Corp.*,
  410 U.S. 526 (1973) ...................................................................... 45–46

ix

*United States v. Fenzl*,
  670 F.3d 778 (7th Cir. 2012) ............................................................. 56

*United States v. Giraudo*,
  No.14-cr-00534-CRB-1, 2018 WL 2197703 (N.D. Cal. May
  14, 2018) .......................................................................................... 56

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.,
  Inc.*,
  668 F.2d 1014 (9th Cir. 1982) ............................................................. 60

## Statutes

15 U.S.C. § 1 *et seq.* .......................................................................... 1, 6

28 U.S.C. § 1291 ................................................................................... 6

28 U.S.C. § 1331 ................................................................................... 6

28 U.S.C. § 1337 ................................................................................... 6

## Other Authorities

U.S. Dep't of Justice, *Justice Manual, Criminal
  Enforcement* 7-3.310-20 (2022) ......................................................... 9

FTC & U.S. Dep't of Justice, *Antitrust Guidelines for
  Collaborations Among Competitors* 25–27 (2000) ...................... 50, 51

Louis Altman & Malla Pollack, 1 *Callmann on Unfair
  Competition, Trademarks & Monopolies*, § 4:49 (4th Ed.) ................ 60

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An
  Analysis of Antitrust Principles and Their Application*
  (4th & 5th eds. 2021, online) ........................................... 50–51, 56, 64

Ninth Circuit Rule 26-3 ....................................................................... 45

Ninth Circuit Rule 28-2.6 ..................................................................... 69

Fed. R. App. P. 4 .................................................................................... 6

Fed. R. App. P. 32(a)(7)(b) .................................................................. 70

# INTRODUCTION

Flextronics International USA, Inc. with its affiliates (collectively, "Flex") is a global manufacturer that buys inductors and other electronic components to build everything from phone chargers to pacemakers for customers in the U.S. and abroad. Flex purchased over $750 million worth of inductors relevant to this case.

Flex alleges that Defendants[1] conspired to fix, raise, stabilize, and maintain supra-competitive inductor prices in violation of the Sherman Act, 15 U.S.C. § 1. Defendants did so in part by secretly exchanging

---

[1] Flex's Fourth Amended Complaint named Appellee Defendants Panasonic Corporation, Panasonic Corporation of North America, Panasonic Electronic Devices Co. Ltd, Panasonic Industrial Devices Corporation of North America (collectively, "Panasonic" or the "Panasonic Defendants"); Sagami Elec Co., Ltd., Sagami America, Ltd. (collectively, "Sagami" or the "Sagami Defendants"); Sumida Corporation, Sumida Electric Co., Ltd., Sumida America Components, Inc. (collectively, "Sumida" or the "Sumida Defendants"); and Non-Appellee Defendants Murata Manufacturing Co., Ltd., Murata Electronics North America, Inc., Murata Power Solutions, Inc., TOKO Inc. (now known as Saitama Murata Manufacturing Co., Ltd.) (collectively, "Murata" or the "Murata Defendants"); Taiyo Yuden Co., Ltd., Taiyo Yuden (U.S.A.) Inc. (collectively, "Taiyo Yuden" or the "Taiyo Yuden Defendants"); TDK Corporation; TDK-EPC Corporation; TDK Corporation of America; TDK U.S.A. Corporation (collectively, "TDK" or the "TDK Defendants") and Tokin Corporation and Tokin America, Inc. (collectively, "Tokin") as co-conspirators. *See* Plaintiff-Appellant's Excerpts of Record ("ER") 5-ER-603. For readability, references to "Defendants" include Tokin.

individual, detailed, non-public, pricing and production information and forecasts at trade association subcommittee meetings. Defendants coordinated prices and reached anticompetitive agreements targeting individual large customers at these meetings and elsewhere. This conduct spanned from at least January 1, 2003 through December 31, 2017.

The detailed allegations in the operative complaint are supported by contemporaneous meeting minutes and emails.[2] Flex exhaustively described the detailed individual, non-public information and forecasts Defendants secretly exchanged and the topics that Defendants discussed, including collective efforts to maintain market prices and collective responses to individual customer price reduction demands. Flex alleged

---

[2] Defendants' conspiracy was one of three conspiracies targeting the three types of passive electronic components—inductors, capacitors, and resistors. Panasonic and Tokin were involved in more than one of these conspiracies. Some of the same individuals and the same trade association were involved in the other conspiracies as well. Flex's allegations regarding the Appellee-Defendants are in large part drawn from documents specifically discussing inductors that were produced to Flex in *In re Capacitors Antitrust Litig.*, Case No. 3:14-cv-03264-JD, MDL No. 17-md-02801 (N.D. Cal.) ("*Capacitors*") and *In re Resistors Antitrust Litig.*, Case No. 3:15-cv-03820-JD, 3:18-cv-04495-JD (N.D. Cal.) ("*Resistors*"). *See Capacitors*, Civil Minutes, No. 14-cv-03264-JD (N.D. Cal. May 31, 2019) (modifying *Capacitors* Protective Order); *Resistors,* Notice of Withdrawal, 15-cv-03820-JD (N.D. Cal. Oct. 11, 2019) (same).

an expert economist's opinion that Defendants' exchanges of information and discussions were more consistent with a conspiracy than independent action. Flex also alleged in detail Defendants' efforts to maintain the meetings' secrecy and certain meeting participants' admissions that the meetings likely were unlawful.

The district court nevertheless dismissed Flex's complaint. Proceeding from the assumption that Flex's supposed failure to allege parallel pricing was "fatal," *see* 5-ER-810, the district court ignored or refused to credit most of Flex's conspiracy allegations. 1-ER-8; *see* 5-ER-832 (requiring parallel conduct allegations before considering circumstantial evidence of conspiracy); 1-ER-7–8 (adopting the prior dismissal order and requiring Flex to allege statistically reliable evidence of parallel pricing).

The district court also brushed off compelling circumstantial evidence of the alleged conspiracy and refused to draw inferences in Flex's favor because, in the court's view, Flex had not alleged "a single instance where any Defendant reached an agreement," 2-ER-226, or presented allegations "*demonstrating* that the [Appellees] behaved

improperly or conspired with the other named Defendants[.]"  1-ER-8 (emphasis added).

The district court's approach is inconsistent with *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and its progeny.

*First*, the court erred by requiring Flex to plead parallel pricing among all Defendants.  *Twombly* does not require a plaintiff to allege parallel pricing.  *See* 550 U.S. 544.  *Twombly* merely held that parallel conduct allegations are not sufficient to state to claim.  *Id.*  The Supreme Court did not hold or even suggest that such allegations are always necessary.  *See id.* at 563.  The court's formulaic requirement that a plaintiff relying on circumstantial evidence must plead parallel conduct is both wrong and inconsistent with the requirement that an antitrust complaint should be viewed holistically.

*Second,* the court erred by discounting Flex's allegations of circumstantial evidence and refusing to draw reasonable inferences in Flex's favor.  Flex's Third Amended Complaint included the following allegations, among many others:

- On July 4, 2007, Defendants . . . exchanged confidential information about sales forecasts and . . . discussed whether to increase inductor prices;

- On November 14, 2008, at a trade association meeting, Defendants discussed prices for inductors with each other and reached a directional price agreement to not reduce prices.

6-ER-890, ¶¶ 205–06; 6-ER-891, ¶ 209.[3]

The court quoted many of Flex's detailed allegations, including the two above, but deemed them inadequate because "Plaintiff does not cite a single instance where any Defendant reached an agreement to fix the prices of inductors at any [trade association] meeting." 5-ER-818. The court thus effectively required Flex to allege direct evidence of the conspiracy. That is error, especially at the pleading stage.

*Third*, the court erred by requiring Flex to plead parallel pricing as to each Defendant with statistical accuracy. Even were parallel pricing allegations required – and they are not – the district court's requirement that Flex plead parallel pricing as to each Defendant runs contrary to well-accepted notions of joint and several liability and would limit antitrust enforcement to substantial purchasers with access to statistically accurate pricing data from each defendant and expensive economic experts. The decision below should be reversed.

---

[3] Corresponding allegations are in the 4AC. *See* 5-ER-734, ¶ 605; 5-ER-739, ¶ 627; 5-ER-746, ¶ 669.

## JURISDICTIONAL STATEMENT

The district court's jurisdiction rested on 15 U.S.C. § 1 *et seq.* and 28 U.S.C. §§ 1331 and 1337. The district court entered its order dismissing Flex's Fourth Amended Complaint on February 3, 2022. 1-ER-3–11.

This Court's jurisdiction rests on 28 U.S.C. § 1291. Flex timely filed a notice of appeal on February 16, 2022. 3-ER-346; *see* Fed. R. App. P. 4(a)(1).

## STATEMENT OF THE ISSUES

I.    Whether the district court erred by misapplying the federal pleading standard, which requires that a claim be merely plausible and requires the court to accept non-conclusory allegations as true?

II.    Whether the district court erred by requiring a showing of parallel conduct before considering other circumstantial evidence of an alleged antitrust conspiracy?

III.    Whether, even if a showing of parallel conduct was required, the district court erred by failing to consider Flex's allegations of parallel conduct and imposing an unreasonably high standard on Flex's parallel pricing allegations?

6

# STATEMENT OF THE CASE

## I.  Nature of the Case

This case arises from an alleged conspiracy to rig bids and fix, raise, stabilize, and maintain the price of inductors at supra-competitive levels. Defendants' conduct caused Flex to pay substantially more for inductors than it would have in a competitive market.

## II.  Statement of Relevant Procedural Background

### A.  The Direct Purchaser Class Case

In January 2018, a proposed class of inductor direct-purchaser plaintiffs (the "DPPs") filed suit against the defendants alleging violations of Sections 1 and 3 of the Sherman Act.  3-ER-372, Dkt. No. 1. The DPPs' initial complaint was filed without the benefit of TDK's cooperation, further discussed below.

The district court granted defendants' motion to dismiss the DPPs' first consolidated amended class action complaint with leave to amend on September 24, 2019.  6-ER-939–963.  The court deemed the DPPs' failure to plead parallel conduct in the form of parallel pricing "fatal" to their claim.  *See* 5-ER-810.  The district court also took issue with the DPPs' use of "average pricing" and reliance on a price index.  6-ER-945,

7

947.  The court criticized the DPPs for not citing "to any case in which average data was deemed sufficient to plead parallel conduct to support an antitrust claim."  6-ER-945–946.

On January 13, 2021, the court granted the defendants' motions to dismiss the DPPs' second consolidated amended class action complaint. 2-ER-127–157.  The district court held that DPPs still had not adequately alleged parallel pricing; had failed to plead direct evidence of an overarching conspiracy; and lacked standing to pursue claims arising from a more limited conspiracy.  *See* 2-ER-156–157.

The DPPs filed a third amended complaint on July 19, 2021 against only three defendants.  3-ER-410, Dkt. 464.  On February 3, 2022, the district court dismissed that complaint for lack of Article III standing.  1-ER-10.

## B.    Flex's Individual Case

In January 2019, before the first DPP complaint was dismissed, Flex filed an individual (non-class) complaint alleging a conspiracy among the Defendants.  *See* 3-ER-353, Dkt. No. 1.  Shortly afterward, Defendant TDK identified itself as an applicant for Type B leniency pursuant to the Department of Justice Antitrust Division's Leniency

8

Program and began cooperating with Flex. [4] 5-ER-780, ¶¶ 854, 855. During two proffer sessions with Flex's counsel, TDK admitted to engaging in anticompetitive conduct in the inductors market and implicated two other Defendants—Taiyo Yuden and Murata—in the collusive conduct. 5-ER-656, ¶ 225. TDK also produced roughly 400 documents from its employees' custodial files reflecting the anticompetitive activity TDK proffered. 5-ER-656, ¶ 225.

Flex filed an Amended Complaint on October 17, 2019 to address the issues raised in the court's September 24, 2019, order granting the motion to dismiss the DPPs' case. *See* 3-ER-358, Dkt. No. 60. Flex subsequently filed a Second Amended Complaint on November 15, 2019 and a Third Amended Complaint (the "3AC") on December 23, 2019 to correct the names of certain defendants in light of TDK's cooperation. 3-ER-358, Dkt 69; 3-ER-359, Dkt 81 (sealed); 6-ER-840–938 (unsealed).

On August 21, 2020, the court dismissed Flex's 3AC with leave to amend. *See* 5-ER-807–838. The court held that allegations of circumstantial evidence "are irrelevant to determining whether the

---

[4] Type B leniency requires the applicant to both report its participation in the illegal activity and confess wrongdoing. *See* Dep't of Justice, *Justice Manual, Criminal Enforcement* 7-3.310-20 (2022).

[complaint] made out a viable Section 1 claim" unless the plaintiff also alleges parallel conduct, "even if [circumstantial evidence and plus factors] plausibly allege illegal conduct by Defendants." 5-ER-833. The court then incorrectly found that Flex "does not dispute that it has failed to allege parallel conduct," 5-ER-832, and thus that Flex failed to state a claim. The court also held that Flex failed to allege standing. The court noted that "it is possible Plaintiff can cure its allegations by alleging, among other things, that it was particularly harmed . . . and by alleging parallel activity." 5-ER-838.

Flex filed its Fourth Amended Complaint (the "4AC") on November 7, 2020.[5] 5-ER-603–806. The 4AC included substantial new allegations detailing how the conspiracy impacted Flex and new parallel pricing allegations supported by expert economic evidence. Flex also alleged additional details regarding the nature and effect of Defendants' information-sharing agreement and an expert's opinion that Defendants' conduct likely reflected collusion. And Flex included new allegations regarding the inductor market's susceptibility to collusion. *See, e.g.*, 5-

---

[5] The 4AC was initially filed under seal with redactions. The 4AC was refiled with revised redactions on February 1, 2021. 5-ER-603–806.

ER-611–612, ¶¶ 16–20; 5-ER-685–686, ¶ 414; 5-ER-686–687, ¶¶ 418–
422; 5-ER-689, ¶¶ 428–430; 5-ER-690, ¶¶ 432–433; 5-ER-691, ¶ 436; 5-
ER-691–695, ¶¶ 438–456; 5-ER-697–699, ¶¶ 465–475; 5-ER-711–718, ¶¶
511–539; 5-ER-763–765, ¶¶ 760–769.  On April 30, 2021, Defendants
moved to dismiss Flex's 4AC.  4-ER-509–601.  The district court heard
oral argument on July 8, 2021.  2-ER-13–126.

Between July 2021 and January 2022, Non-Appellee Defendants
Murata, TDK, Taiyo Yuden, and Tokin were dismissed by stipulation.  3-
ER-369, Dkt. No. 193; 3-ER-369, Dkt. No. 198; 3-ER-370, Dkt. No. 202;
3-ER-370, Dkt. No. 205.

## C.    The Disposition Below

On February 3, 2022, the district court dismissed Flex's 4AC with
prejudice. [6]  1-ER-3–11.

In its nine-page order, the court "refers the Parties to its prior
orders and AFFIRMS those orders herein," and expressly referenced the
order dismissing Flex's 3AC and the order dismissing the DPPs' second
amended complaint.   1-ER-4; *see* 5-ER-807-838 and 2-ER-127–157

---

[6] The February 3, 2022 order also dismissed the DPPs' third amended
complaint.  1-ER-3–11.

(earlier orders). The court also stated that it "only addresses the portions of Defendants' motion to dismiss as it relates to the Panasonic, Sagami, and Sumida Defendants alleged involvement in the market-wide conspiracy." 1-ER-5.

The court held that Flex "had not remedied the deficiencies identified by the Court in its earlier order" in two regards: "First, Flextronics again fails to plead parallel pricing among the Panasonic, Sagami, and Sumida Defendants and the named co-conspirators[.]" 1-ER-7. And, "[s]econd, the complaint does not allege how the Panasonic, Sagami, and Sumida Defendants 'joined the conspiracy and played some role in it.'" 1-ER-8.

On the first issue, the district court found that "Flextronics engaged an expert to demonstrate statistical evidence of parallel pricing, but the expert could only demonstrate such pricing among the TDK, Murata, and Taiyo Yuden Defendants" and not as to Panasonic, Sagami, or Sumida. 1-ER-7. And, while Flex put forth "price comparisons" related to Panasonic, Sagami, and Sumida, the district court held that "these price comparisons do not demonstrate parallel pricing because they do not

show any trends, patterns, or relationships among the Defendants' pricing over time." 1-ER-7–8.

On the second issue, the district court found that "[w]hile the [4AC] alleges that the Panasonic, Sagami, and Sumida Defendants participated in the [Japan Electronics & Information Technology Association ("JEITA") meetings], the Ninth Circuit has clearly stated that 'mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.'" 1-ER-8. The court further found that Flex "does not allege new facts showing that Defendants exchanged improper information at these meetings," and "[t]here are thus no allegations demonstrating that the [Appellees] behaved improperly or conspired with the other named Defendants." 1-ER-8.

## STATEMENT OF FACTS

### I.   Summary of Liability-Related Facts.

Defendants agreed to meet both as a group under the auspices of JEITA, a trade association, and informally to exchange detailed confidential pricing and production forecasts and coordinate prices. 5-ER-720–721, ¶¶ 548–559.

The data exchanges enabled Defendants to police collusive agreements and avoid competition that otherwise could have driven down inductor prices. 5-ER-720, ¶ 549; 5-ER-725, ¶ 568–570. Defendants also used these meetings to discuss prices and to reach agreements regarding both whether to increase market prices generally and whether to acquiesce to individual customer requests for price reductions. 5-ER-745, ¶¶ 663–664; 5-ER-746–747, ¶¶ 669–671.

Defendants' discussions and data exchanges were kept strictly confidential. Defendants consistently admonished each other not to disclose the information they exchanged and to "handle with care" any written material reflecting the information exchanges. 5-ER-742–743, ¶¶ 644–665.

Defendants used the euphemism "information exchange" to describe the collusive discussions that took place at JEITA meetings and elsewhere. 5-ER-738–741, ¶¶ 625–638. In 2010 a Detroit-based Panasonic employee Mr. Takiguchi, responsible for pricing both resistors and inductors to the U.S. automotive industry, lamented increased scrutiny of anticompetitive conduct at JEITA subcommittee meetings by noting:

14

In the past, there was a lot of material, such as which customers are increasing, *which we called information exchange that would now be acknowledged as a compliance violation*. [. . .] Furthermore, with fair trade law becoming more strict, the information exchange itself has become difficult, and a valuable place for industry exchange has become watered down.

5-ER-740–741, ¶ 635 (emphasis added). Mr. Takiguchi's phrasing "what we called information exchanges" amounts to an admission that the term was a euphemism to describe anticompetitive communications. 5-ER-741, ¶ 637; *see also* 5-ER-739–740, ¶¶ 628–634 (referring to anticompetitive agreements targeting individual large purchasers as "information exchanges").

Defendants TDK, Taiyo Yuden, and Murata also reached agreements targeting the prices for certain large purchasers, including Flex. These Defendants also referred to their collusive discussions and bid-rigging agreements as "information exchanges." 5-ER-739–740, ¶¶ 628–634. The details of these agreements, which were proffered by TDK to obtain the benefits of the Antitrust Criminal Penalty Reform Act, are set forth in the 4AC.[7] 5-ER-738–41, ¶¶ 625–38.

---

[7] Flex dismissed its case against these three Defendants, TDK, Taiyo Yuden, and Murata by stipulation prior to the district court's order dismissing the 4AC. *See supra* at 11.

15

## II.    Inductors and the Passive Components Market.

Inductors are electronic components that store energy in the form of a magnetic field.  5-ER-644, ¶ 163.  Inductors act as governors, or regulators, of energy in a circuit.  5-ER-646, ¶ 172.  When current increases, an inductor absorbs energy and drops voltage.  5-ER-646, ¶ 172.  When current decreases, it acts as a source of energy, creating voltage as it releases stored energy.  5-ER-646, ¶ 172.

Inductors are classified primarily by inductance, which is the ability of an inductor to store energy in the form of a magnetic field.  5-ER-646, ¶ 173.  Inductance is measured in the unit of the Henry (µH).  *Id.*  Inductors are sold by specifications that relate to inductance, voltage, and size.  5-ER-646, ¶ 174.  These measures are standardized.  *Id.*  Inductors with the same inductance, core, and size are substantially fungible.  *Id.*  Inductors with common characteristics are manufactured for use by the entire industry.  5-ER-644, ¶ 164.  Other inductors are manufactured in response to specific customer requests (for a specific inductance, voltage, or size).  5-ER-644, ¶ 164.  All inductors, whether manufactured for a specific customer or not, are reasonably

interchangeable because they can easily be manufactured by any Defendant upon request. 5-ER-644, ¶ 164.

Along with resistors (a component having a specific amount of resistance to the flow of an electrical current) and capacitors (a two-terminal electronic component that stores potential energy in the form of an electrical field), inductors are part of the larger category of "passive electronic components." 5-ER-644, ¶ 165. Capacitors, resistors, and inductors work together to form closed circuits that power nearly all electronic products. 5-ER-646, ¶ 176; 5-ER-647, ¶ 178 (image of Flex-manufactured phone charger illustrating the placement of inductors, capacitors, and resistors in the product).

Passive components are inexpensive and ubiquitous. 5-ER-771, ¶ 799. The overwhelming majority of passive components, including inductors, cost well under $1.00, and most cost well under ten cents. Many cost less than a penny. *See, e.g.*, 5-ER-697–699, ¶¶ 465–475. Electronic goods such as laptop computers and cellular phones typically contain hundreds or even thousands of passive components. 5-ER-645, ¶ 168.

There are many similarities in how inductors, capacitors, and resistors are marketed, sold, and used. Many companies, including Flex, therefore centralize passive component sales, marketing, and purchasing activities. 5-ER-644, ¶ 166. For example, Flex employees responsible for purchasing resistors and capacitors also typically purchase inductors. 5-ER-644, ¶ 166. The same is true on the seller side. Flex suppliers that manufacture several different passive components generally rely on the same sales and marketing employees to market and sell different types of passive components. 5-ER-645, ¶ 167.

Defendants' employees involved in marketing capacitors were often thus also responsible for marketing inductors. For example, Tokin's Mr. Tomohide Date, who was indicted for fixing the price of capacitors,[8] also marketed inductors for Tokin. 5-ER-615, ¶ 32. Similarly, Panasonic's Mr. Hitoshi Takiguchi, who in 2010 admitted that at JEITA meetings "what we called information exchange would now be a compliance violation," marketed both inductors and capacitors. 5-ER-740–741, ¶ 635. Groups of passive component manufacturers met under the

---

[8] *See United States v. Asawa, et al.*, No. 4-15-cr-00163-JD, ECF No. 15 (N.D. Cal.). Mr. Date remains a fugitive.

auspices of JEITA, as did sub-groups or "working committees" of Defendants and other inductor manufacturers. 5-ER-702, ¶ 484; 5-ER-707–708, ¶ 496.

## III. Plaintiff Flextronics International USA, Inc.

Flextronics International USA, Inc., is a California corporation headquartered in San Jose. 5-ER-619, ¶ 52. Flex manufactures electronic products and other goods in the United States and around the world. 5-ER-619, ¶ 52. Flex directly purchased inductors from Defendants to manufacture electronic products for Flex's customers. 5-ER-651–652, ¶¶ 195–198. Many of Flex's customers are United States-based companies that sell electronic products for consumer, medical, automotive, aerospace, and defense applications, among others. 5-ER-619, ¶ 53. Flex purchased hundreds of millions of dollars of inductors directly from Defendants and their co-conspirators. 5-ER-619, ¶ 54.

### A. Flex's Inductor Procurement.

Flex negotiates prices with inductor manufacturers on a quarterly, semi-annual, and annual basis. 5-ER-654, ¶ 214. Negotiated prices are often set by reference to benchmark prices established for the Flex customer in question. 5-ER-654, ¶¶ 217–218. Flex's Global Commodity

Management team purchases millions of inductors annually. 5-ER-652, ¶ 199; 5-ER-655, ¶ 219; 5-ER-655, ¶ 220. This affords Flex deep knowledge of inductor pricing and inductor market conditions. Flex's allegations regarding inductor pricing and the inductors market are informed by substantial institutional knowledge of the market.

## B. Flex's Investigation of the Allegations in the Operative Complaint.

Flex was a plaintiff in the *Capacitors* and *Resistors* antitrust actions. 5-ER-608, ¶ 2. Both actions alleged—based in part on information provided by Defendant Panasonic, the amnesty applicant in both actions—that passive component manufacturers periodically met to exchange detailed market and pricing information to artificially inflate the price of those passive components. 5-ER-610–611, ¶ 13. Although discovery in the actions focused on capacitors and resistors, respectively, certain evidence was adduced that related to inductors. *See supra* n. 2. This is unsurprising given the overlapping defendants, personnel, and trade associations involved. 5-ER-720–721, ¶ 553. Flex sought and obtained amendments to the protective orders in *Capacitors* and *Resistors* to permit reference to evidence obtained in the other passive

component cases. *See supra* n. 2. That evidence—all of which relates specifically to inductors—formed the basis of most of Flex's substantive allegations of market-wide conspiracy.

Flex also engaged an expert economist, Dr. Russell Lamb, to review both the available pricing data and the qualitative evidence of conspiracy and opine whether: (1) the pricing data demonstrated parallel pricing; and (2) the Defendants' behavior at JEITA subcommittee meetings was more consistent with independent action or collusion. *See* 5-ER-711–718, ¶¶ 512–539. Flex alleged Dr. Lamb's conclusions on those points.

## IV. The Defendants

Defendants are Japan-based corporate families which manufacture inductors, either directly or through their subsidiaries or affiliates. 5-ER-620–632, ¶¶ 59–95. Defendant TDK is a leniency applicant with the Department of Justice, and thus has admitted to criminal violations of the antitrust law. 5-ER-655, ¶ 222. TDK has admitted that it and certain other Defendants named in Flex's 4AC took actions in furtherance of a conspiracy to inflate the price of inductors in the United States and fixed the price of inductors sold in the United States. 5-ER-655, ¶ 223. Defendants Panasonic and Tokin also participated in a conspiracy to

inflate the price of capacitors. Panasonic was a leniency applicant; Tokin's predecessor NEC Tokin, pleaded guilty. 5-ER-757, ¶ 732–733. Defendants TDK, Taiyo Yuden, Panasonic, and Tokin are all recidivist violators of U.S. and foreign antitrust law. *See* 5-ER-757–761, ¶¶ 731–752.

### A. JEITA

Defendants were members of the JEITA, a trade organization for Japanese electronics manufacturers formed in 2000. 5-ER-699–700, ¶ 478. JEITA includes five sector-specific boards. 5-ER-700, ¶ 481. The Passive Components Committee ("PCC") and its Inductors Subcommittee are the boards relevant here. 5-ER-700, ¶ 481. Confidential, company-specific information and forecasts were shared and discussed at both PCC meetings and Inductors Subcommittee meetings. 5-ER-702, ¶ 484. Prior to 2004, Defendants also met in a group known as the "Coil Working Group" and exchanged confidential, forward-looking price and production information at those meetings. 5-ER-707–708, ¶ 496.

At least 67 inductors-related meetings (including Inductors Subcommittee meetings) occurred during the conspiracy period, and at

least 60 employees of Defendant companies attended those meetings. 5-ER-703, ¶ 490.[9]

## V. The Alleged Conspiracy

### A. Defendants Exchanged Detailed Individual Price and Production Forecasts that Permitted Defendants to Monitor and Enforce the Conspiracy.

Defendants periodically submitted confidential company-specific price and production information to JEITA. JEITA then created detailed charts showing each Defendant's past and present inductor sales volume, market share, revenue, average unit price, highest and lowest unit prices, as well as each Defendants' future projections of the same information. *See, e.g.*, 5-ER-722–724, ¶¶ 564–565. The information also included prior year information to use as a baseline against which Defendants could compare current and forecasted results. *See, e.g.*, 5-ER-722–724, ¶¶ 564–565. Charts containing every Defendants' information were circulated to each Defendant. *See, e.g.*, 5-ER-722–724, ¶¶ 564–565. Exemplar charts were included in the 4AC. *See* 5-ER-722–

---

[9] Flex only has access to the minutes of a few meetings that were obtained during discovery in the *Capacitors* and *Resistors* litigations. *See supra* n. 2; 5-ER-708, ¶ 499. Defendants possess the vast majority of the evidence.

724, ¶¶ 564–565; 5-ER-724–725, ¶¶ 566–567; 5-ER-726–729, ¶¶ 573–579.[10]

The information Defendants secretly exchanged thus afforded all Defendants contemporaneous knowledge of each Defendant's: (1) inductors sales volume; (2) inductors market share; (3) inductors sales revenue; (4) inductors average selling prices; (4) highest and lowest inductor prices; and (5) forecasts of the same information. 5-ER-721, ¶ 555. This detailed information was exchanged in secret, often included code names, and was provided *only* to competitors. 5-ER-743–745, ¶¶ 650–660.

After JEITA distributed the survey results, the members of the PCC or the Inductors Subcommittee (depending on the time period) met in person to discuss the survey results and the charts depicting individual company results. 5-ER-721, ¶ 557. The information shared through JEITA provided Defendants with a clear data set to monitor each Defendant's past and current average price level, production volume, and

---

[10] Although the detailed information JEITA provided to each Defendant identified individual companies by sequential alphabetical letters rather than by name, Defendants were able to discern each Defendant's identity and thus knew which price, production and market share information applied to each Defendant. *See* 5-ER-721, ¶¶ 555–556.

market share. 5-ER-721, ¶ 558. This in turn permitted Defendants to monitor compliance with conspiratorial agreements and enforce agreed-upon norms. 5-ER-721, ¶ 558.

The information shared allowed each participant a remarkably deep understanding of its supposed competitors' inductors business. 5-ER-725, ¶ 570. For example, the last row of a chart reflecting information exchanged in 2003 shows that 2002 results served as a baseline from which a "percent change" column was calculated. 5-ER-722, ¶ 563. This provided each competitor with real-time knowledge as to whether any competitor was gaining or losing market share or raising or lowering prices. 5-ER-724–725, ¶¶ 566–567. Such knowledge allowed Defendants to identify any Defendant that increased its market share unexpectedly or lowered its average sales price unexpectedly and thus might have deviated from a collusive agreement among Defendants. 5-ER-724, ¶ 565. Similar information was exchanged in at least 2004, 2005, and 2007. 5-ER-725–728, ¶¶ 572–577.

For example, in May of 2007 Sagami reported that fourth quarter 2006 inductor revenue was 103% of 2005 inductor revenue, and that 2007 quarterly year-to-date and forecasted inductor revenue was 99–106% of

2006 revenue, depending on the quarter. 5-ER-733, ¶ 599. Similarly, Murata reported that fourth quarter 2016 revenue was 113% of fourth quarter 2005 revenue, and that quarterly year-to-date and forecasted revenue for 2007 was between 108% and 115% of inductor revenue for 2006, depending on the quarter. 5-ER-733, ¶ 600. Defendants then discussed and explained to their supposed competitors the reasons for any substantial increases or decreases in the measured metrics. 5-ER-733, ¶ 601.

Defendants also used PCC meetings as an opportunity for informal collaboration. For example, in January of 2013 Panasonic employee Mr. Hiroya Nishimoto reported on information obtained at a PCC meeting and noted that "some of it is lobby information which is not from the official meeting, so please handle it carefully" and "be careful about re-distributing this email." 5-ER-710, ¶ 505. Mr. Nishimoto's report included inductors production forecasts. 5-ER-710, ¶ 505.

## B. Defendants Used The Information Exchanged to Monitor and Enforce Anticompetitive Agreements and Artificially Inflate Inductor Prices.

Defendants used the information exchanged at PCC and Inductor Subcommittee meetings to ensure that none of them were deviating from

their agreements regarding price and market share. For example, at the May 2007 meeting a competitor demanded that Murata explain the revenue increase reflected in the information Murata provided. 5-ER-733, ¶ 602. Murata explained that it merely was selling a different mix of higher-priced inductors. 5-ER-733, ¶ 603.

Defendants also used the information to formulate and agree on pricing strategy. For example, the minutes of the May 2007 meeting reflect a discussion among Defendants as to how to respond to individual customer "cost down" requests, which were requests for price decreases. 5-ER-745–746, ¶ 664–665. In November 2008, the then-chairman of JEITA told the PCC members that "it is not the time to reduce prices." 5-ER-746, ¶ 669. And a Panasonic employee's contemporaneous notes of a PCC meeting discussing inductors, which occurred shortly before June 18, 2010, acknowledge industry-wide "[p]rice increase/price reduction suppression efforts" and state that: "At consumer PCC, price reductions were suppressed while assessing competitor prices." 5-ER-746–747, ¶ 671.

### C. JEITA Members Acknowledged that the Meetings Were Unlawful or a Compliance Violation.

JEITA members knew their conduct at meetings likely violated antitrust law. For example, on February 23, 2005, a United Chemi-Con employee, Mr. Noriaki Kakizaki, sent his notes of a February 17, 2005 JEITA PCC meeting to his superiors with the cover email: "In North America, these sorts of meetings are completely prohibited, so please take utmost care in the handling of the attached memo." 5-ER-742, ¶ 640. At least Defendants Taiyo Yuden, Murata, and Panasonic attended the meeting in question. 5-ER-742, ¶ 640.

In November of 2012, Panasonic's Detroit-based Senior Product Specialist responsible for automotive pricing for both resistors and inductors, Mr. Takiguchi, told fellow employees that the JEITA information exchanges "would now be acknowledged as a compliance violation" and that fair-trade laws had made exchanging the information more difficult. 5-ER-742, ¶ 641. And Mr. Koichi Mukaiyama, the President of KOA who served as a Chair of the PCC during the conspiracy period, acknowledged that participating in certain aspects of the JEITA meetings "can put the company at risk of being deemed as taking part in antitrust activities." 5-ER-742, ¶ 642.

28

### D. Defendants Agreed On a Common Formula for Calculating Publicly-Reported Average Per Unit Inductor Prices.

Defendants used a "Consumption Factor" ("CF") to calculate the average sales price by region that was published in certain trade periodicals. 5-ER-711, ¶ 509. These publicly reported prices were then often used as a guideline in inductors price negotiations. 5-ER-749, ¶ 688. Rather than using an independent third-party to collect the pricing data, JEITA participants directly collected individual company data from member companies, including Defendants. 5-ER-711, ¶ 510. JEITA participants exchanged material and non-public information related to the formulation of the CF from at least January of 2009 through early 2016. 5-ER-711, ¶ 510.

Beginning in at least 2014, Defendants, including Appellees, collusively agreed on the CF to be used to calculate that year's publicly reported prices. 5-ER-711, ¶ 510. Sagami's Mr. Suzuki explicitly recognized that Defendants' selection of the CF would impact the unit price of inductors sold by Defendants, stating: "Our company is concerned about the balance between the quantity and the amount of money (of course, it also affects the unit price), but I do not think that the fixed

29

amount is a little higher." 5-ER-750, ¶ 692. Mr. Date of NEC Tokin replied that he was not sure what the CF would be, but that he would follow TDK's recommendation. 5-ER-750, ¶ 693. Defendants then agreed on the CF that JEITA would apply to those types of inductors. 5-ER-750, ¶ 693. This collusive agreement inflated publicly reported prices and allowed Defendants an opportunity to charge higher transactional prices.

### E.    Defendants' Exchanges of Information And Collusive Discussions Were More Consistent With Concerted Than Individual Action.

Flex retained an expert economist, Dr. Russell Lamb, to review the information exchanges in this case and opine as to whether they plausibly reflected collusive conduct. 5-ER-711–712, ¶ 512. Dr. Lamb received a Ph.D. in economics from the University of Pennsylvania in 1994 and has spent over 25 years studying economics. 5-ER-711–712, ¶ 512. Dr. Lamb's research has been published in peer-reviewed journals such as the *Journal of Econometrics*, *Journal of Development Economics*, *CATO Journal*, *Regulation*, and others. 5-ER-712, ¶ 513. Dr. Lamb has served as a referee for leading economics journals, including the *International Economic Review*, *Journal of Business and Economic Statistics*, *Journal of Labor Economics*, *American Journal of Agricultural*

30

*Economics*, and *Contemporary Economic Policy*. 5-ER-712, ¶ 513. Courts across the United States have routinely admitted Dr. Lamb to testify as an economics expert in antitrust matters.[11] 5-ER-712, ¶ 514.

Dr. Lamb reviewed the documents and pricing data in this case and opined that: "the exchanges of information alleged are more consistent with anticompetitive conduct among Defendants than with independent oligopolistic behavior." 5-ER-729, ¶ 580. The information exchanges permitted Defendants to monitor each other's compliance with market share and pricing agreements and to police the conspiracy. 5-ER-731, ¶ 587. For example, the revenue and volume information allowed Defendants to identify whether other Defendants were complying with market allocation and price agreements. 5-ER-731, ¶ 588. Notes of PCC meetings reflect that Defendants were asked to explain large or

---

[11] S*ee, e.g.*, *In re Domestic Drywall Antitrust Litigation*, No. 2:13-md-02437 (E.D. Pa.); *In re Polyurethane Foam Antitrust Litigation*, No. 1:10-md-02196 (N.D. Ohio); *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 2:09-cv-00852 (E.D. Wash.); *In re Puerto Rican Cabotage Antitrust Litigation*, No. 3:08-md-01960 (D.P.R.); *In re Aftermarket Auto. Lighting Prods. Antitrust Litigation*, No. 2:09-md-02007-GW (PJWx) (C.D. Cal.); *In re Titanium Dioxide Antitrust Litigation*, No. 10-cv-00318-RDB (D. Md.); *Allan v. Realcomp II, Ltd, et al.*, No. 2:10-cv-14046 (E.D. Mich.).

unexpected increases in revenue or sales volumes to competitors. *See* 5-ER-745–747, ¶¶ 661–672.

Similarly, the market share information Defendants collected allowed each Defendant to determine whether any other Defendant was increasing its market share at the expense of another Defendant. 5-ER-731, ¶ 589. Notes of PCC meetings also reflect that Defendants were often asked to explain large or unexpected increases in market share. *See* 5-ER-745–747, 661–672. The unit price comparison information allowed Defendants to identify any Defendant charging unusually low prices or prices that would drive down other prices. 5-ER-733, ¶ 601. And that is what happened: Murata was asked to explain its unusually high average prices at a PCC meeting. 5-ER-733, ¶ 602.

In short, and as alleged in the 4AC, Dr. Lamb opined that the exchanges of detailed price and market share information make sense only if Defendants were conspiring with each other to manipulate natural market forces and inflate prices. 5-ER-731, ¶ 591. It would not be sensible for a competitor acting independently to provide its competitors with the information shared here. 5-ER-731, ¶ 592. The forecast information exchanged was sufficiently detailed that firms acting

independently would not risk providing competitors with such information in the absence of an agreement not to compete with one another. 5-ER-731, ¶ 592. A firm that knows its competitors' prices and production levels – and future price and production levels – knows precisely how to gain market share at its competitors' expense. 5-ER-731–732, ¶¶ 592–594.

Dr. Lamb also opined that the secret nature of the information exchanges strongly suggests collusion. Absent collusion, no benefit accrues to a competitor that reveals its confidential price and production forecasts *only* to its competitors. 5-ER-731, ¶¶ 594–596.

Nor do the conversations at the PCC meetings discussed above make sense absent a conspiracy. Dr. Lamb reviewed the notes of the May 2007 PCC meeting, which included Sagami's admission that it was "struggling in handling" a steep rise in input costs and reflected a discussion among Defendants as to the appropriate response to customer "cost down" (or price reduction) requests, and concluded these discussions were unlikely to have taken place absent collusion. 5-ER-746, ¶ 668.

**F.   Inductor Market Conditions Were Conducive to Conspiracy.**

Inductors are commoditized products; there are a relatively small number of significant variations in inductor type.  5-ER-770, ¶¶ 793–795.  There are no direct substitutes for inductors.  5-ER-777, ¶ 838.

During the conspiracy period, the inductors market was highly concentrated with Defendants collectively maintaining a majority share.  5-ER-763, ¶ 760.  There were significant barriers to entry in the market.  5-ER-772, ¶ 809. For example, new entrants would be required to invest substantial capital to build manufacturing facilities, obtain patents or licenses for technology, create a production line, and assemble a workforce, among other things. 5-ER-772, ¶ 809. Although small Chinese inductors manufacturers entered the global inductors market in 2003, these manufacturers were unable to impose pricing discipline on Defendants.  5-ER-769–770, ¶¶ 789–792.  Chinese inductors were considered to be lower quality than Defendants' inductors.  5-ER-766, ¶ 775.

Despite decreases in demand and other volatility at points during the conspiracy period, inductor prices were often resilient and tended to move steadily.  5-ER-779, ¶¶ 846–847.

34

### G.   Defendants' Prices Were Parallel.

Flex engaged Dr. Lamb to conduct a thorough analysis of Defendants' pricing.  Dr. Lamb analyzed Flex purchasing data reflecting over $750 million of direct inductor purchases from Defendants over the conspiracy period.  5-ER-713, ¶ 519.  To address the district court's concerns, Flex's analysis did not involve a price index and analyzed only data reflecting purchases of inductors.  5-ER-713, ¶ 519.  The data Dr. Lamb analyzed was maintained by Flex in the ordinary course of business and used to track its purchasing.  5-ER-713, ¶ 520.  Despite daunting sample size limitations, Dr. Lamb was able to conclude that Defendants' prices of popular comparable categories of inductors moved in parallel fashion over the conspiracy period.  5-ER-714, ¶ 527; 5-ER-714, ¶ 529; 5-ER-715, ¶ 530.

Flex's purchases from certain Non-Appellee Defendants (TDK, Taiyo Yuden, and Murata) were sufficient for Dr. Lamb to conduct a statistical analysis of their pricing.  5-ER-715–717, ¶¶ 532–534.  Flex did not, however, purchase sufficient inductors from Appellee Defendants Panasonic, Sagami, and Sumida to permit statistical pricing analysis.  Dr. Lamb therefore reviewed the Appellees' prices and concluded they

were parallel based on his experience and expertise. 5-ER-717, ¶ 535.
Flex included certain exemplar price comparisons reflecting Flex
purchases from Appellees to support its allegations on this point. 5-ER-
713–718 ¶¶ 527–539.

### SUMMARY OF THE ARGUMENT

*Twombly* requires merely that a plaintiff plead facts that plausibly
suggest an agreement in violation of Section 1 of the Sherman Act.
*Twombly* does not require pleading any particular facts, such as parallel
conduct or parallel pricing. *Twombly* also acknowledges that many
antitrust cases are based entirely on circumstantial evidence given
conspirators' common desire to conceal illegal conduct. And consistent
with well-understood evidentiary practice, *Twombly* draws no formal
distinction between direct and circumstantial evidence. *See* 550 U.S. 554.

As set out below, the district court fundamentally misapplied the
federal pleading standard for antitrust cases by: (1) imposing an overly
rigid formula in which pleading parallel conduct is a prerequisite to the
consideration of other circumstantial evidence;[12] (2) compounding that

---

[12] The district court's opinion on this issue is flatly at odds with the
district court's rulings in the *Capacitors* and *Resistors* antitrust
litigations. The court overseeing those cases straightforwardly rejected

error by requiring detailed proof of parallel pricing that is practically impossible to provide before discovery; (3) refusing to give Flex's allegations the required presumption of truth; and (4) compartmentalizing and often disregarding voluminous and significant circumstantial evidence of a plausible conspiracy.

The court's two-part test requiring a plaintiff to plead parallel conduct is flawed. A plaintiff that plausibly alleges a conspiracy, whether through allegations of circumstantial or direct evidence, should be permitted to proceed to discovery, even without parallel conduct or parallel pricing.

In any event, Flex plausibly alleged parallel conduct. Flex alleges that Defendants agreed to meet in secret and exchange highly confidential present and forward-looking price and production information, and reached agreements regarding market-wide price movements and individual customer prices. *See, e.g.*, 5-ER-672, ¶¶ 332–333. Periodic meetings at which Defendants exchange information and

---

the argument that antitrust plaintiffs are required to allege parallel pricing or conduct. *See, infra* at 46–47.

discuss and agree on prices are a form of parallel conduct. Each Defendant is doing the same thing at the same time.

Flex also alleged parallel pricing. Flex's expert economist Dr. Russell Lamb performed a statistical analysis of Defendants' pricing where there was sufficient data for such analysis and examined Defendants' pricing where there was not sufficient data. Dr. Lamb's conclusion was straightforward: Defendants' prices were parallel throughout the conspiracy period. *See* 5-ER-711–718, ¶¶ 511–539. The court disregarded Dr. Lamb's conclusions as to Appellees because Dr. Lamb could not perform a statistically reliable analysis of Appellees' prices and thus purportedly could not show the effect of the conspiracy.

The district court compounded its error by sidestepping any serious consideration of Flex's allegations of circumstantial evidence. It incorrectly viewed information exchanges at trade associations as exempt from scrutiny because, in the court's view, Flex had not adequately alleged parallel pricing. Even if Flex's parallel pricing allegations were insufficient, these allegations of illegal exchanges of pricing information alone are enough to survive a motion to dismiss. The court's approach thus fundamentally misapplied *Twombly*'s plausibility requirement.

This Court should reverse the district court's order and remand for further proceedings.

## STANDARD OF REVIEW

This Court reviews de novo a district court's order granting a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Mudpie Inc. v. Travelers Cas. Ins. Co. of Am.,* 15 F.4th 885, 889 (9th Cir. 2021). This Court must accept all non-conclusory facts as true and draw all reasonable inferences in Flex's favor. *ASW v. Oregon*, 424 F.3d 970, 974 (9th Cir. 2005).

## ARGUMENT

### I. The District Court Misapplied This Circuit's Pleading Standards.

#### A. Flex Was Merely Required to Plausibly Allege A Conspiracy to Pursue Its Section 1 Sherman Act Claim.

It is well understood that at the pleading stage a plaintiff alleging an antitrust conspiracy must merely present "a complaint with enough factual matter (taken as true) to suggest that an agreement was made" in violation of Section 1 of the Sherman Act. *Twombly*, 550 U.S. 544, at 545.

"Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Therefore, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable" and that a recovery is remote and unlikely. *Id.*

At the motion to dismiss stage, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And it is axiomatic that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Put differently, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *In re HighTech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (quoting *Continental Ore*); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 33 n.4 (D.D.C.

2008) (noting that *Twombly* did not change the *Continental Ore* standard). The district court disregarded these well-established rules.[13]

## B. The District Court Erred by Deeming Flex's Allegations of Circumstantial Evidence Irrelevant Absent Allegations of Parallel Conduct.

The question facing courts considering a motion to dismiss an antitrust conspiracy complaint is "whether plaintiffs have pleaded sufficient facts to provide a plausible basis from which [the court] can infer the alleged agreements' existence." *Musical Instruments*, 798 F.3d at 1193. There are no hard and fast rules governing the substance of the plaintiffs' allegations. "Pleading an antitrust complaint is not like performing a religious rite—there are no particular words that must be uttered in a particular sequence." *In re Capacitors Antitrust Litigation,* 154 F. Supp. 3d 918, 930 (N.D. Cal. 2015).

---

[13] The district court's order dismissing the 4AC indicated that the court was "only address[ing] . . . the Panasonic, Sagami, and Sumida Defendants' alleged involvement in the market-wide conspiracy." 1-ER-5. It is unclear, however, which, if any, allegations the court reviewed given the brevity of the court's opinion and the court's citation to Defendants' reply brief rather than any allegations in the 4AC. The court's focus on Appellees and its refusal to engage the entirety of the evidence were pervasive errors.

A plaintiff's complaint should therefore be sustained if the allegations therein, whatever their substance, plausibly allege a conspiracy. *See, e.g.*, *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1061-64 (N.D. Cal. 2015) (plaintiffs met their pleading burden through numerous allegations of substantive agreements); *In re Resistors Antitrust Litig.*, No. 15-CV-03820-JD, 2017 WL 3895706, at *2 (N.D. Cal. Sept. 5, 2017) (denying motion to dismiss where complaint did not allege parallel conduct or pricing but plausibly alleged a conspiracy); *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 626 (E.D. Mich. 2012) ("[T]his Court is aware of no case law—nor have [d]efendants identified any—that mandates that a plaintiff's portfolio of circumstantial evidence in a § 1 case *must* include proof of parallel conduct."); *Hogan v. Cleveland Ave Rest. Inc.*, No. 2:15-CV-2883, 2018 WL 1475398, at *4 (S.D. Ohio Mar. 26, 2018) ("Plaintiffs are not *required* to show parallel conduct; it is merely a vehicle (in combination with other 'plus factors') that can be used to show circumstantial evidence of a conspiracy.") (emphasis in original).

Of course, parallel conduct among competitors sometimes is circumstantial evidence of conspiracy. *In re Citric Acid Litig.*, 191 F.3d

1090, 1102 (9th Cir. 1999) (parallel pricing is "a relevant factor to be considered along with the evidence as a whole"); *Stanislaus Food Prod. Co. v. USS-POSCO Indus.,* 803 F.3d 1084, 1092 (9th Cir. 2015) (same); *see also Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 158 (S.D.N.Y. 2010) ("Parallel pricing is merely 'one such form of circumstantial evidence.'") (internal citation omitted).

However, both lawful competitors and conspirators engage in parallel conduct.  Plaintiffs who elect to rely on parallel conduct as circumstantial evidence of a conspiracy must therefore plead additional allegations (sometimes called "plus factors") that plausibly suggest a conspiracy. *Twombly,* 550 U.S. at 564–66*; Musical Instruments,* 798 F.3d at 1193.

For example, in *Twombly*, the plaintiffs asserted that the decisions of local telephone service providers not to compete against each other in their respective markets was circumstantial evidence of conspiracy.  550 U.S. at 564–66.  Similarly, in *Musical Instruments*, plaintiffs asserted that guitar manufacturers' decisions to adopt similar advertising policies were circumstantial evidence of a conspiracy.  798 F.3d at 1193.

43

Because both the *Twombly* and the *Musical Instruments* plaintiffs chose to rely on parallel conduct as circumstantial evidence of conspiracy, they were required to allege additional circumstantial evidence of a conspiracy beyond mere parallel conduct. *Twombly*, 550 U.S. at 553–554; *Musical Instruments*, 798 F.3d at 1193. But nothing in *Twombly* or *Musical Instruments* requires or even suggests that antitrust plaintiffs *must* allege parallel conduct.

On the contrary, both cases teach that parallel conduct is often as consistent with competition as conspiracy, especially in oligopolistic markets. *Twombly*, 550 U.S. at 554 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."); *Musical Instruments*, 798 F.3d at 1194. It makes no sense to ignore plausible circumstantial evidence of a conspiracy unless the plaintiff alleges an additional fact (parallel conduct) that is as consistent with competition as conspiracy.

44

The district court thus erred by accepting Defendants' argument[14] that parallel conduct allegations are a mandatory element of a Section 1 case that relies on circumstantial evidence. *See* 2-ER-154 ("The failure to plead parallel pricing obviates the need to consider Plaintiffs' remaining circumstantial evidence."); 5-ER-832 ("[p]lus factors are relevant only if the complaint adequately alleges parallel conduct") (quoting *Bona Fide Conglomerate v. SourceAmerica*, 691 F. App'x 389, 390 (9th Cir. 2017) (unpublished and non-precedential under Ninth Circuit Rule 26-3)); 5-ER-833 ("even if [circumstantial evidence and plus factors] plausibly allege illegal conduct by Defendants" the allegations "are irrelevant to determining whether the [complaint] made out a viable Section 1 claim" unless the plaintiff also alleges parallel conduct).

The district court's approach would require courts to disfavor circumstantial evidence, which the Supreme Court, this Court, and countless others have recognized is "the lifeblood of antitrust law." *E.g.*, *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 53 (9th Cir. 2022) (quoting *United States v.*

---

[14] *See, e.g.*, 4-ER-421; 2-ER-168 (portions of Defendants' briefing arguing that parallel conduct is required).

45

*Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973)). This Court has long noted that conspiracies are "rarely susceptible of direct proof." *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 671 (9th Cir. 1980). And "[t]he proof is largely in the hands of the alleged conspirators." *Poller v. Columbia Broadcasting Systems, Inc.*, 368 U.S. 464, 473 (1962).

The district court's approach nevertheless elevates labelling and box-checking over holistic analysis, and runs contrary to the well-understood rule that "circumstantial evidence is not inherently less probative than direct evidence." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 853 n.4 (9th Cir. 2002) (quotation marks omitted). There is no logical reason that a plaintiff with compelling circumstantial evidence should be required to allege parallel pricing, when a plaintiff with weak is not.

## C. Flex Plausibly Alleged that Appellees Conspired in Violation of Section 1.

### 1. *Flex provided Defendant-Specific Allegations.*

Flex's allegations state a plausible claim as to Panasonic, Sagami, and Sumida. A complaint "need not plead each defendant's involvement in the alleged conspiracy in elaborate detail." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008). Specific

"insight into closed-door meetings . . . is not necessary to survive a motion to dismiss." *Id.* at 1050.

Flex's allegations set forth in extraordinary detail Defendants' decade-long agreement to secretly exchange current and future price, production, and capacity information, and to coordinate pricing to artificially inflate inductor prices. 5-ER-719–762, § XII. The 4AC identified certain specific meetings—both formal JEITA meetings and informal meetings and social outings—attended by named individuals from Defendants' corporate families during the conspiracy period. *See, e.g.*, 5-ER-732, ¶ 598; 5-ER-734, ¶ 605; 5-ER-745, ¶ 663.

For example, on July 10, 2007, Sumida's Masataka Suzuki and Teruo Hirota and Sagami's Koichi Ogiso and Daijiro Tsuruga met with other Defendants and exchanged and reviewed average unit price forecasts of inductors sales for the second half of 2007. 5-ER-734, ¶¶ 605–606. Similarly, named and un-named Panasonic representatives participated in conspiratorial meetings on multiple occasions, including June 24, 2004, February 23, 2005, June 18, 2008, and June 18, 2010. Defendants shared competitively sensitive information, such as detailed company-specific projections on customer orders, at each of these

meetings. *See, e.g.*, 5-ER-710, ¶ 505; 5-ER-725, ¶ 568; 5-ER-725–726, ¶ 572; 5-ER-735, ¶ 611; 5-ER-739, ¶ 627; 5-ER-742, ¶ 640; 5-ER-743, ¶ 648; 5-ER-746–747, ¶ 671.

Sagami's representatives also attended numerous meetings, including on June 24, 2004, May 25, 2007, and July 10, 2007, at which Defendants secretly shared various highly sensitive revenue metrics and projections, and discussed conditions impacting the U.S. market. *See, e.g.*, 5-ER-725, ¶ 568; 5-ER-725–726, ¶ 572; 5-ER-733, ¶ 599; 5-ER-734, ¶ 605; 5-ER-745, ¶ 663. Sumida's representatives were present at many of those same meetings, including on June 24, 2004 and July 10, 2007. *See, e.g.*, 5-ER-725, ¶ 568; 5-ER-725–726, ¶ 572; 5-ER-734, ¶ 605.

The 4AC also details specific anticompetitive conduct, including directional price agreements and agreements targeting individual customer requests for price reductions that occurred in connection with the identified meetings. *See* 5-ER-745–47, ¶¶ 661–772. This is enough to state a plausible claim against each Appellee Defendant.

### 2. *Defendants' Conduct at JEITA Trade Association Meetings Plausibly Suggests a Conspiracy.*

The district court improperly assumed that trade association activity was exempt from scrutiny absent direct evidence of price-fixing.

*See* 5-ER-818 (disregarding JEITA-related allegations because: "Plaintiff does not cite a single instance where any Defendant *reached an agreement* to fix the prices of inductors at any JEITA meeting") (emphasis added). [15] The district court's approach appears driven by its interpretation of dicta in *Citric Acid* to the effect that "mere participation" in a trade organization does not suggest an illegal agreement. 1-ER-8.

But that approach misapplies *Citric Acid,* which supports reversal. In *Citric Acid*, the defendants submitted "figures on production and sales" to a third party, which then aggregated the information and distributed *only the aggregated information* to trade association members "to preserve the confidentiality of individual members' sales and production figures." 191 F.3d at 1098.

*Citric Acid* affirmed summary judgment largely because there was no evidence that individual information was exchanged. *Id.* at 1099. Under such circumstances, merely participating in trade association

---

[15] The district court amply demonstrated its narrow view of conduct that could plausibly suggest an agreement at the hearing on Defendants' motion to dismiss: "I understand these dinners. I think I understand the backdrop of these captives [sic] of industry who meet and have their dinners and discuss these things, but is there information about these conversations that really relate to an actual price fixing? . . . is there anything specific about the price fixing?" 2-ER-81–82 (emphasis added).

49

meetings that created "an opportunity" to conspire was insufficient to withstand summary judgment. *See Citric Acid*, 191 F.3d at 1097. Here, in contrast, Flex plausibly alleges that Defendants secretly exchanged *individual* price and production information and forecasts. 5-ER-720–721, ¶¶ 548–559.

Such exchanges fall well outside the FTC and DOJ's "safety zone" governing information exchanges with competitors. 5-ER-736–37, ¶ 613–17; 5-ER-722, ¶ 563; FTC & U.S. Dep't of Justice, *Antitrust Guidelines for Collaborations Among Competitors* 25–27 (2000).

>           a.   *Defendants' Information Exchanges Plausibly*
>                *Support a Conspiracy.*

Courts routinely hold that information exchanges like those alleged here strongly imply collusion. *See, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig.,* 580 F. Supp. 2d 896 (N.D. Cal. 2008) (holding plaintiffs sufficiently pleaded facts suggesting a price-fixing conspiracy where "[d]efendants had an ongoing agreement to exchange price information and intended this exchange would lead to price stabilization or increases"); *In re Flash Memory*, 643 F. Supp. 2d at 1148. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶¶ 1409a, 1406 (4th & 5th

eds. 2021, online) ("[a] meeting or exchange may be understood to reflect an agreement on conduct discussed at that meeting or exchange").

There is no procompetitive aspect to the information sharing alleged here: preparing secret pricing forecasts only for the benefit of your competitors to inflate prices makes no sense absent collusion. And exchanges of recent and future pricing plans, as seen here, are especially suggestive of an unlawful agreement. *Todd v. Exxon Corp.*, 275 F.3d 191, 211 (2d Cir. 2001) (citing *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 398–99 (1921) ("exchanges of future price information are considered especially anticompetitive"); *see also* FTC & U.S. Dep't of Justice *Antitrust Guidelines*, *supra*, at 15 ("[T]he sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information."); *SRAM,* 580 F. Supp. 2d at 902 ("[T]he exchange of price information alone can be 'sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act.'") (quoting *United States v. Container Corp. of Am.,* 393 U.S. 333, 335 (1969)); *In re Mercedes-Benz Anti-Trust Litig.,* 157 F. Supp. 2d 355, 361 (D.N.J. 2001) (denying dismissal where "[i]t is fairly alleged that the information

exchanged was not merely historical, but . . . also included future pricing plans"); *Miami Products & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 164–65 (W.D.N.Y. 2020) (participation in trade association meetings coinciding with price increases may plausibly suggest a conspiracy).

Indeed, exchanging future price and production plans is the quintessential example of conduct that "would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement" and can support the inference of conspiracy. *Musical Instruments*, 798 F.3d at 1195; *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (exchanging price information at association meetings "facilitates price fixing"). It is reasonable to infer a defendant who furnishes a competitor with future pricing information generally does so pursuant to an "expectation that it would be furnished reciprocal information when it wanted it." *Container Corp.*, 393 U.S. 333 at 335.

Unsurprisingly, Dr. Lamb opined that the Defendants' information exchanges were more consistent with anticompetitive conduct among Defendants than with independent oligopolistic behavior. 5-ER-729, ¶ 580. These information exchanges afforded Defendants an effective way

to police the conspiracy. The revenue and volume information allowed Defendants to identify whether other Defendants were complying with market allocation and price agreements. 5-ER-731, ¶ 588. The sales and market share information allowed Defendants to determine whether other Defendants were cheating on the conspiracy in some fashion (for example, lowering prices) that would increase market share. 5-ER-731, ¶ 589. And the average unit price information allowed Defendants to identify any Defendant charging lower prices that could drive down market prices. 5-ER-731, ¶ 590.

The district court erred by failing to credit Dr. Lamb's opinion that the information exchanges Flex alleges were against Defendants' self-interests absent conspiracy and are more consistent with collusion than competition. 5-ER-614, ¶ 29.

> b. *Defendants' Discussions and Coordinated Pricing at JEITA Meetings Plausibly Support a Conspiracy.*

Defendants' substantive discussions at JEITA meetings, as reflected in various meeting notes and contemporaneous correspondence, also plausibly suggest a conspiracy. Defendants routinely discussed specifics around customer pricing. 5-ER-741, ¶ 637. For example,

Appellees and other Defendants discussed how to respond to customer requests for price decreases (or "cost-down" requests) in May 2007 and November 2007. 5-ER-745–746, ¶ 664. And in November 2008, the PCC members were informed that "it is not the time to reduce prices." 5-ER-746, ¶ 669.

Defendants also made statements against their self-interest absent collusion. As referenced in JEITA meeting notes specific to inductors, in May of 2007, Sagami told its competitors it was "struggling in handling the steep rises in the price of materials and the environment." 5-ER-747, ¶ 673. A genuine competitor would not share that it was "struggling" to handle increasing input costs, because that information could be used by a competitor to compete more effectively. 5-ER-747–748, ¶¶ 673–682.

Dr. Lamb reviewed these statements made by Sagami and notes of the "cost down" discussion from May 2007 and opined that such communications were more consistent with collusion than lawful independent behavior. 5-ER-614, ¶ 29; 5-ER-746, ¶ 668.

Defendants' admissions that their conduct at JEITA meetings was anticompetitive also plausibly suggests conspiracy. Panasonic's Mr. Takiguchi admitted that the JEITA "information exchanges" would now

be "acknowledged as a compliance violation." 5-ER-740–741, ¶ 635. Participants knew that "these sorts of meetings are completely prohibited." 5-ER-742, ¶ 640. Even the Chair of the PCC during the conspiracy period conceded that certain aspects of JEITA meetings "can put the company at risk of being deemed as taking part in antitrust." 5-ER-742, ¶ 642.

Defendants' efforts to maintain the secrecy of the meetings further suggests conspiracy. Defendants reminded each other that written information memorializing their discussions had to be handled with "utmost care." 5-ER-742, ¶ 640. Panasonic's Mr. Nishimoto instructed his colleagues to be "careful about re-distributing" the "lobby information" obtained through the PCC. 5-ER-710, ¶ 505. The district court erred by disregarding these allegations.

### D. Even if Parallel Conduct is Required, Flex Adequately Alleged Parallel Conduct in Two Forms.

#### 1. *Defendants' Secret Exchanges of Current and Future Price and Production Information Were Parallel Conduct.*

Flex adequately alleged parallel conduct. Although the district court focused on parallel pricing, parallel conduct includes conduct other than parallel pricing. *See, e.g.*, *DRAM*, 28 F.4th 42 at 47 ("The district

court found that Plaintiffs adequately established parallel conduct by alleging that Defendants contemporaneously restricted their DRAM production during the class period . . . ."); *In re High-Tech Emp. Antitrust Litig.*, 856 F.Supp.2d 1103 (N.D. Cal. 2012) (Section 1 claim survived without parallel pricing allegations; parallel conduct was a series of identical "Do Not Cold Call" agreements).

Indeed, actions like this one that include bid-rigging allegations are less likely to involve parallel pricing. Bid-rigging conspirators often intentionally submit differing bids so that the designated conspirator wins. *See United States v. Giraudo*, No.14-cr-00534-CRB-1, 2018 WL 2197703, at *4 (N.D. Cal. May 14, 2018) ("[B]id-rigging may be accomplished . . . with an agreement to 'rotate' bids—I win this round, you win next round. (Indeed, that is the usual method.)."); *see also United States v. Fenzl*, 670 F.3d 778, 780 (7th Cir. 2012) (explaining that bid rigging is "a form of price fixing in which bidders agree," usually by rotating bids, "to eliminate competition").

Flex's plausible allegations that Defendants agreed to meet and reciprocally exchange secret current and future pricing, production, and capacity plans are allegations of parallel conduct. *See* Areeda, ¶ 1409a;

56

*see also* 2-ER-103–104 ("getting together and agreeing to exchange that information, that detailed information is parallel conduct").  The district court erred by failing to consider these allegations.[16]

> 2. *The District Court Erred By Rejecting Flex's Parallel Pricing Allegations.*

Flex also plausibly alleged parallel pricing.  Dr. Lamb conducted an analysis of Flex's purchase data and certain documents underlying Flex's allegations.   Based upon his opinions, Flex alleged: (1) statistical analyses of Flex inductor pricing throughout the conspiracy period; (2) allegations that inductor prices were parallel; (3) sixteen examples of price comparisons where sample sizes did not permit statistical analysis; and (4) analysis of the very limited data produced by Defendants thus far. 5-ER-711–719, ¶¶ 512–545.

Dr. Lamb used Flex's purchase data to analyze the price movements of four different types of inductors Flex commonly purchased during the conspiracy period.  5-ER-712, ¶¶ 516–517; 5-ER-713, ¶¶ 519–520; 5-ER-715, ¶ 530; 5-ER-718, ¶¶ 540–41.  Dr. Lamb compared only the

---

[16] The district court's order dismissing the 3AC erroneously concluded that Flex "does not dispute that it has failed to allege parallel conduct." 5-ER-832.   The district court's order addressing the 4AC, however, focused entirely on parallel *pricing*. 1-ER-3–11.

prices of comparable categories of inductors and limited his statistical analysis to comparable products where there was a large enough sample size for meaningful analysis. 5-ER-712–713, ¶¶ 517–518; 5-ER-713, ¶¶ 522–524. Flex's allegations do not rely on any index or database that included prices for any component other than inductors. 5-ER-713, ¶¶ 519–520. Nor does Flex rely on "average" pricing across all inductors. 5-ER-713, ¶¶ 521–522.

Where Dr. Lamb was unable to construct a statistical analysis because of limited purchasing data,[17] he identified price comparisons supporting Flex's pricing allegations. 5-ER-713–718, ¶¶ 527–539. Panasonic and Sagami pricing showed very similar trend lines over time for certain popular inductor types and were nearly identical by 2012. 5-ER-719, ¶ 545.

Rather than accepting the plausibility of Flex's parallel pricing allegations, the district court imposed a pleading burden that is both practically insurmountable before full discovery and unsupported by the case law. The district court deemed Flex's pricing allegations insufficient

---

[17] Flex purchased large amounts of inductors directly from Taiyo Yuden, TDK, and Murata. It purchased smaller amounts from Panasonic, Sagami, Sumida, and Tokin. 5-ER-716–717, ¶¶ 534–535.

because: 1) Flex was unable to demonstrate *statistically significant* evidence of parallel pricing as to *all* Defendants; and 2) Flex's price comparisons purportedly did not "demonstrate trends, patterns, or relationships" among certain Defendants' pricing over time.  1-ER-8.[18] Neither showing is required.

First, requiring Flex to "demonstrate" parallel pricing through "statistical analysis" effectively turns *Twombly*'s plausibility requirement into a probability requirement.  Flex does not need to *prove* parallel pricing through expert work or otherwise to withstand a motion to dismiss.  Expert opinion that plausibly supports an allegation is sufficient.  *See generally Nicholson v. Fitzgerald Auto Mall*, No. Civil Action No. RDB-13-3711, 2014 WL 2124654, at *7 (D. Md. May 20, 2014) ("Although the expert's determination may ultimately prove to be

---

[18] The district court did seem to recognize that allegations supported by expert work can support a complaint in the face of a motion to dismiss. 1-ER-7.  *See, e.g.*, *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004) (relying on expert testimony allegations to reverse order of dismissal); *O'Connor v. Boeing N. Am., Inc.*, No. CV 97-1554 DT (RCx), 2004 WL 5519343, at *8 (C.D. Cal. Sep. 13, 2004) (expert opinion supported denial of motion to dismiss).  The court erred, however, by imposing too high a burden at the pleading stage.

unsupported by the evidence, the Plaintiff need not prove his case at this juncture.").

Second, requiring individual defendant-by-defendant pricing allegations frustrates the principle of joint and several liability. Antitrust plaintiffs need not have purchased from all conspirators and need not have made substantial purchases from any conspirator. *See William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*, 668 F.2d 1014, 1053 (9th Cir. 1982) ("[A]ntitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy."); Louis Altman & Malla Pollack, 1 *Callmann on Unfair Competition, Trademarks & Monopolies*, § 4:49 (4th Ed.) ("[E]ach member of a price-fixing conspiracy is liable . . . even one who did not sell directly to any of the plaintiffs.").

The district court's approach, however, effectively forecloses recovery by plaintiffs that have not made very substantial purchases from every defendant. Statistically accurate pricing allegations require very substantial purchases of comparable products from multiple defendants over the course of an alleged conspiracy period. That kind of

information typically is available only to large purchasers and only through fulsome discovery.

Third, the district court erred by rejecting Flex's price comparisons for being not parallel enough. Parallel behavior does not mean identical behavior, and the district court should have accepted Flex's allegations of parallel pricing as true. *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.,* 801 F.3d 412, 429 (4th Cir. 2015) (quoting *LaFlamme v. Societe Air France,* 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) ("[P]arallel conduct 'need not be exactly simultaneous and identical in order to give rise to an inference of agreement.'")); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1243 (3d Cir. 1993) ("parallel behavior" requires similar—but not identical—behavior); *In re Domestic Airline Travel Antitrust Litig.,* 221 F. Supp. 3d 46, 69 (D.D.C. 2016) ("Plaintiffs do not need to demonstrate that [d]efendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."). As the district court recognized elsewhere, "[the] case law on antitrust does not require perfect or nearly perfect identity of pricing or other conduct." 2-ER-153. This district court nevertheless disregarded certain exemplar price comparisons as insufficiently parallel.

61

The district court's errors appear premised in part on the misconception that *Musical Instruments* requires statistically precise parallel pricing allegations at the pleading stage.[19]  798 F.3d at 1197 n.14. It does not.  The pricing allegations in *Musical Instruments* were not presented as evidence of parallel conduct.  The alleged parallel conduct was the adoption of similar advertising policies.  *See* 798 F.3d at 1193. Plaintiffs alleged that rising prices themselves were one of the six plus factors that suggested conspiracy.  *Id.* at 1194.

This Court deemed the pricing allegations inadequate for that purpose, because the plaintiffs' pricing data was imprecise and they did

---

[19] Other courts have found that public or industry data as well as aggregated data is probative of a conspiracy in conjunction with other circumstantial evidence.  *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 442–43 (E.D. Pa. 2018) (complaint sufficiently alleged parallel pricing allegations based on data "widely used in the industry" and "generally considered to be reliable;" plaintiff was not required to have actual prices paid by consumers from defendants' transactional data; "[w]hile more may be required on summary judgment, no more is required now"); *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *8 (N.D. Ill. Nov. 6, 2020) (plaintiffs stated a claim by "alleg[ing] a number of plus factors in addition to the aggregate data and they directly connect Defendants to an antitrust conspiracy"); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019) (finding that "aggregated statistics are not irrelevant to Plaintiffs' claim that a conspiracy existed" when tied to other allegations).

not "allege any facts connecting the purported price increase to an illegal agreement among competitors." *Id. at* 1197. *Musical Instruments* does not, however, suggest that a plaintiff must tie price changes to conspiratorial conduct with statistical precision to plausibly allege parallel pricing.

### E. The Court Did Not Holistically Consider New Allegations in the Operative Complaint.

"[C]omplaints are not reviewed in paper thin slices." *In re Resistors Antitrust Litig.*, No. 15-CV-03820-JD, 2017 WL 3895706, at *3 (N.D. Cal. Sept. 5, 2017). Some allegations "viewed in isolation or as only a part of the subset of the allegations" may not satisfy *Twombly*; however, the same allegations may suffice when viewed as a whole. *Id.* By expressly affirming its earlier orders, the district court effectively ignored several categories of new allegations in the 4AC that further demonstrated the conspiracy's plausibility.

> 1. *The court failed to consider new allegations establishing the inductor market's susceptibility to collusion.*

Flex's market condition allegations in the 4AC were newly supported by the opinion of Dr. Lamb. 5-ER-735, ¶ 609; 5-ER-769, ¶ 789. Flex alleged that high market concentration, the commodity nature of

inductors, high barriers to entry, inelastic demand, demand variation, and excess capacity all rendered the inductors market susceptible to conspiracy. 5-ER-762–780, ¶¶ 759–850; *see generally* Areeda, ¶ 2002 (discussing market characteristics susceptible to collusion); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1142 (N.D. Cal. 2009) ("highly concentrated with high barriers to entry—conditions that are conducive to a price fixing conspiracy"). Flex supported these allegations with economic evidence.

For example, Dr. Lamb undertook a quantitative analysis of Chinese inductor manufacturers' share of Flex's inductor purchases. He concluded that the Chinese manufacturers could neither gain share from Defendants nor impose pricing discipline on them. 5-ER-769–770, ¶¶ 789–792. Flex also included new market allegations based on Flex's substantial experience purchasing and using inductors. *See, e.g.*, 5-ER-652–655, ¶¶ 200–221; 5-ER-694, ¶ 451; 5-ER-695, ¶¶ 455–456. The court did not consider these additional allegations.

    2.    *The court failed to consider new allegations further explaining Panasonic's position in the relevant market and its history of recidivism.*

The district court previously found it was "implausible for the Panasonic Defendants to be involved in any inductors conspiracy because they are 'marginal producer[s] and sell[ers] of Inductors'" and "*massive* purchaser[s] of inductors." 5-ER-811. But, Flex never alleged that Panasonic was a "massive purchaser" of inductors. Panasonic's counsel introduced this idea at a May 2, 2019 hearing, stating:

> Panasonic is a marginal producer, seller of inductors. As the Plaintiffs – they say we have a global market share of 5 percent. That may be exalting our position, but we are a massive purchaser of inductors as the plaintiffs allege. We sell scores of billions of dollars of consumer electronics, and we buy a lot of inductors.

3-ER-273.

This statement should not have been considered by the court in analyzing the 3AC. *Krieg v. Mills*, 117 F. Supp. 2d 964, 967 (N.D. Cal. 2000), *aff'd*, 8 F. App'x 663 (9th Cir. 2001) (unpublished) ("in considering a motion to dismiss, a court may not consider material outside of the complaint"); *see also Tan v. GrubHub, Inc.*, 171 F. Supp. 3d 998, 1003 n. 2 (N.D. Cal. 2016) (same). Nevertheless, Flex's allegations in the 4AC further explain Panasonic's position in the market and address the

65

arguments made by its counsel at the earlier hearing. 5-ER-761–762, ¶¶ 753–758. The district court did not appear to consider these new allegations.

Apart from new allegations regarding its market position, Flex has continually alleged Panasonic was the leniency applicant in both the capacitors and resistors conspiracies. 5-ER-615, ¶ 33. A Panasonic employee with responsibility for marketing inductors and resistors admitted that the information exchanges at JEITA meetings would be compliance violations. 5-ER-742, ¶ 641. *See In re DRAM*, 28 F.4th 42, 53 (historic price fixing behavior supports plausibility of conspiracy "particularly when the prior conspiracy and the alleged subsequent conspiracy have factual overlap or involve the same actors"). Flex did not receive the benefit of having its allegations construed in the light most favorable to it or considered holistically.

## CONCLUSION

For the foregoing reasons, the order of the district court should be reversed, and the case should be remanded for further proceedings.

66

Dated: June 27, 2022                    Bryan Cave Leighton Paisner LLP

By: */s/ Charles E. Tompkins*

Charles E. Tompkins
1155 F Street NW, Suite 700
Washington, DC 20004-1357
Telephone: (202) 508-6000
Facsimile: (202) 508-6200
Email:
charles.tompkins@bclplaw.com

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant Flex respectfully requests that this Court hear oral argument in this case.

## STATEMENT OF RELATED CASES

Plaintiff-Appellant Flex states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(b) because it contains 12,275 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).