No. 22-15231

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FLEXTRONICS INTERNATIONAL USA, INC.,

*Plaintiff-Appellant*,

v.

PANASONIC CORPORATION, ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
Case No. 5:19-cv-00078-EJD (Hon. Edward J. Davila)

## ANSWERING BRIEF FOR APPELLEES

Alfred C. Pfeiffer, Jr.
Elizabeth C. Gettinger
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

Gregory G. Garre
*Counsel of Record*
Marguerite M. Sullivan
Allyson M. Maltas
Charles S. Dameron
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

September 12, 2022

*Counsel for Defendants-Appellees Sumida Corporation,
Sumida Electric Co., Ltd., and Sumida America Components, Inc.*

*(additional counsel on inside cover)*

Cynthia E. Richman
Amalia Reiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

Daniel Glen Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
dswanson@gibsondunn.com

Eli M. Lazarus
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel for Defendants-Appellees Panasonic Holdings Corporation f/k/a
Panasonic Corporation and Panasonic Corporation of North America*

J. Maxwell Cooper
Jason M. Allen
KESSENICK GAMMA LLP
1 Post Street
Suite 2500
San Francisco, CA 94104
(415) 362-9400
mcooper@kgf-lawfirm.com

*Counsel for Defendants-Appellees Sagami Elec Co., Ltd.,
and Sagami America Ltd.*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee Sumida Corporation states that it has no parent corporation, and no publicly held corporation owns ten percent or more of Sumida Corporation's stock. Defendant-Appellee Sumida Electric Co., Ltd. states that its parent corporation is Sumida Corporation, and no other publicly held corporation owns ten percent or more of Sumida Electric Co., Ltd.'s stock. Defendant-Appellee Sumida America Components Inc., which changed its name to Sumida America Inc., effective December 31, 2021, states that its ultimate corporate parent is Sumida Corporation, and no other publicly held corporation owns ten percent or more of its stock.

Defendant-Appellee Panasonic Corporation, which changed its name to Panasonic Holdings Corporation, effective April 1, 2022, states that it has no parent corporation, and no publicly held corporation owns ten percent or more of its stock. Defendant-Appellee Panasonic Corporation of North America (PNA) states that its parent corporation is Panasonic Holding (Netherlands) B.V., a privately-owned corporation that owns more than ten percent of PNA. Prior to this litigation, Panasonic Electronic Devices Co. Ltd., was merged into Panasonic Corporation and was not a distinct legal entity at any time during this litigation. Further, prior to this litigation, Panasonic Industrial Devices Corporation of America was merged into PNA and was not a distinct legal entity at any time during this litigation.

Defendant-Appellee Sagami Elec Co., Ltd. states that it has no parent corporation and no publicly held corporation owns ten percent or more of its stock. Defendant-Appellee Sagami America Ltd. states that it is a wholly-owned subsidiary of Sagami Elec Co., Ltd., a private corporation. No publicly held corporation owns any of Sagami America Ltd.'s stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENTS ........................................................ i

TABLE OF AUTHORITIES ............................................................................... v

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE CASE ........................................................................... 7

    A.    The Market For Inductors And Preceding Litigation............................ 7

    B.    Procedural Overview Of This Case ..................................................... 10

    C.    Flex's Operative Allegations Against Appellees ................................ 13

    D.    Decisions Below ................................................................................. 14

SUMMARY OF ARGUMENT ........................................................................ 16

STANDARD OF REVIEW ............................................................................. 18

ARGUMENT ................................................................................................... 19

I.    THE DISTRICT COURT PROPERLY DISMISSED FLEX'S FOURTH AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM .......................................................................................................... 19

    A.    The District Court Correctly Recognized That Flex's Information-Sharing Allegations Did Not Plausibly State A Price-Fixing Claim In The Absence of Parallel-Pricing Allegations ......................................................................................... 19

        1.    In Circumstantial Price-Fixing Cases, Plaintiffs Must Generally Plead Parallel Pricing And "Plus Factors"............... 19

        2.    Antitrust Plaintiffs May Not Rest A Price-Fixing Complaint Solely On Allegations Of Information-Sharing At Trade Association Meetings ................................................. 26

        3.    Flex's Allegations Concerning The Participation Of Panasonic, Sagami, And Sumida Executives In JEITA Meetings Do Not Raise A Plausible Inference Of Conspiracy ................................................................................. 31

**Page**

B.  The District Court Correctly Recognized That Flex's Parallel-Pricing Allegations Were Deficient .....................................................36

   1.  Flex's Information-Exchange Allegations Are Not Sufficient Parallel Conduct To State A Price-Fixing Conspiracy Claim.....................................................36

   2.  Flex Did Not Plausibly Allege That Panasonic, Sagami, and Sumida Engaged In Parallel Pricing ...............................41

C.  Flex's Remaining Arguments Are Unavailing...................................46

   1.  Flex's Own Allegations Indicate That The Inductor Market Is Dynamic And Competitive......................................47

   2.  Flex's Panasonic-Specific Arguments Provide No Basis For Reversal ...........................................................................51

CONCLUSION ..........................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*7-Up Bottling Co. of Jasper Inc. v. Archer Daniels Midland Co. (In re Citric Acid Litigation)*,
191 F.3d 1090 (9th Cir. 1999) ...........................................................5, 26, 33, 36

*Arizona v. Standard Oil of California (In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation)*,
906 F.2d 432 (9th Cir. 1990) ...................................................................38

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................19, 34, 51

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................1, 21, 26, 31, 34

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
691 F. App'x 389 (9th Cir. 2017) .................................................4, 21

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993).............................................................................51

*In re Capacitors Antitrust Litigation*,
106 F. Supp. 3d 1051 (N.D. Cal. 2015)...........................................24

*Cason-Merenda v. Detroit Medical Center*,
862 F. Supp. 2d 603 (E.D. Mich. 2012) ..........................................25

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
158 F.3d 548 (11th Cir. 1998) .........................................................21

*Cohen v. NVIDIA Corp. (In re NVIDIA Corp. Securities Litigation)*,
768 F.3d 1046 (9th Cir. 2014) .........................................................19

*Depot, Inc. v. Caring for Montanans, Inc.*,
915 F.3d 643 (9th Cir. 2019) .....................................................18, 19

*In re Domestic Airline Travel Antitrust Litigation*,
221 F. Supp. 3d 46 (D.D.C. 2016)...................................................43

**Page(s)**

*Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation v. Samsung Electronics Co. (In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litigation)*,
28 F.4th 42 (9th Cir. 2022) ....................................................................23

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
832 F.3d 1 (1st Cir. 2016)................................................................23, 26

*In re Flash Memory Antitrust Litigation*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009)..............................................27

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ............................................................40

*In re German Autotomotive Manufacturers Antitrust Litigation*,
___ F. Supp. 3d ___, 2020 WL 1542373 (N.D. Cal. Mar. 31, 2020), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022)...................................................35

*In re GSE Bonds Antitrust Litigation*,
No. 19-CV-1704, 2019 WL 5791793 (S.D.N.Y. Oct. 15, 2019) ......................19

*Havensure, L.L.C. v. Prudential Insurance Co. of America*,
595 F.3d 312 (6th Cir. 2010) ..............................................................35

*Hogan v. Cleveland Ave Restaurant Inc.*,
No. 2:15-CV-2883, 2018 WL 1475398 (S.D. Ohio Mar. 26, 2018) .................24

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ..............................................................1

*Kjessler v. Zaappaaz, Inc.*,
No. 4:18-cv-0430, 2019 WL 3017132 (S.D. Tex. Apr. 24, 2019) ....................20

*Los Angeles Lakers, Inc. v. Federal Insurance Co.*,
869 F.3d 795 (9th Cir. 2017) ..............................................................18

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) .........................................................19, 20

**Page(s)**

*Miami Products & Chemical Co. v. Olin Corp.*,
  449 F. Supp. 3d 136 (W.D.N.Y. 2020) ............................................................27

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
  911 F.3d 505 (8th Cir. 2018) .............................................................21

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
  998 F.2d 1224 (3d Cir. 1993) .............................................................43

*Ramsey v. National Association of Music Merchants (In re Musical
  Instruments & Equipment Antitrust Litigation)*,
  798 F.3d 1186 (9th Cir. 2015) ..................................................*passim*

*In re Resistors Antitrust Litigation*,
  No. 15-cv-03820, 2017 WL 3895706 (N.D. Cal. Sept. 5, 2017) ......................24

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ........................................................21, 43

*Shroyer v. New Cingular Wireless Services, Inc.*,
  622 F.3d 1035 (9th Cir. 2010) .............................................................19

*Tam Travel, Inc. v. Delta Airlines, Inc. (In re Travel Agent
  Commission Antitrust Litigation)*,
  583 F.3d 896 (6th Cir. 2009) .............................................................23

*In re Text Messaging Antitrust Litigation*,
  630 F.3d 622 (7th Cir. 2010) ..................................21, 23, 26, 43, 47

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ......................................15, 40

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ......................................20, 30, 31, 37, 38

*United States v. Diaz*,
  876 F.3d 1194 (9th Cir. 2017) .............................................................34

*United States v. United States Gypsum Co.*,
  438 U.S. 422 (1978).........................................2, 5, 30, 38, 40

**Page(s)**

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017) ...............................................................48

*Whitaker v. Tesla Motors, Inc.*,
    985 F.3d 1173 (9th Cir. 2021) ..........................................................46

*Zenith Radio Corp. v. Matsushita Electric Industrial Co.*,
    402 F. Supp. 262 (E.D. Pa. 1975)......................................................52

## OTHER AUTHORITIES

Lee Bridgett, *Mixed Impacts Across the Food Sector as Inflation Hits*
    *Consumer Spending*, S&P Global, IHS Markit (Aug. 1, 2022),
    https://ihsmarkit.com/research-analysis/mixed-impacts-across-the-
    food-sector-as-inflation-hits.html ......................................................32

CNBC, *American Airlines Forecasts Third-Quarter Profit But Scales*
    *Back Growth After Flight Disruptions* (July 21, 2022),
    https://cnb.cx/3KvCPJY ....................................................................32

FTC & DOJ, *Antitrust Guidelines for Collaborations Among*
    *Competitors* (Apr. 2000),
    https://www.ftc.gov/sites/default/files/documents/public_events/
    joint-venture-hearings-antitrust-guidelines-collaboration-among-
    competitors/ftcdojguidelines-2.pdf....................................................30

Colin P.A. Jones, Book Review, *How Compliance Is Ruining Japan*,
    23 Conn. J. Int'l L. 197 (2007) ..........................................................35

PR Sanjai & Debjit Chakraborty, *Reliance's Profit Misses Estimates*
    *as High Input Costs Bite*, Bloomberg (July 22, 2022),
    https://bloom.bg/3RdsXqc ..................................................................32

*The Unintended Consequences of Increased Steel Tariffs on American*
    *Manufacturers: Hearing Before the House Committee on Small*
    *Business*, 107th Cong. (2002)............................................................33

United States Department of Justice, *Frequently Asked Questions*
    *About The Antitrust Division's Leniency Program And Model*
    *Leniency Letters* (Jan. 26, 2017),
    https://www.justice.gov/atr/page/file/926521/download ....................9

**INTRODUCTION**

The district court gave Plaintiff-Appellant Flextronics International USA (Flex) multiple opportunities to amend its complaint in order to allege a claim that would survive the pleading standards established by this Court for alleging an unlawful price-fixing conspiracy under Section 1 of the Sherman Act. And, after carefully reviewing Flex's fourth amended complaint under those standards, the district court properly held that this complaint should be dismissed. Flex identifies no basis for overturning that considered decision and allowing it a *fifth* bite at the apple. The decision below should be affirmed.

In order to survive a motion to dismiss, a plaintiff alleging a per se unlawful price-fixing conspiracy under Section 1 of the Sherman Act must plausibly allege that the defendant agreed to set prices in concert with a horizontal competitor. There are two ways of doing so. The first is by asserting factual allegations showing directly that the defendant agreed to fix prices. The second (more common) route is to plead *circumstantial* evidence from which the court can infer that the defendant agreed to set prices. But this Court and others carefully police that circumstantial inquiry to ensure that defendants are not unnecessarily subjected to burdensome discovery in litigation where plaintiffs' allegations of conspiracy are implausible. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-59 (2007); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). Thus, in circumstantial cases, to

plausibly allege an unlawful conspiracy, a plaintiff must show not just that the defendant engaged in "parallel conduct" with a competitor—i.e., setting parallel prices—but identify "plus factors" that "distinguish[ ] permissible parallel conduct from impermissible conspiracy." *Ramsey v. National Ass'n of Music Merchs. (In re Musical Instruments & Equip. Antitrust Litig.)*, 798 F.3d 1186, 1194 (9th Cir. 2015).

As Flex acknowledges in its opening brief, and as the district court determined below, this case concerns an alleged price-fixing conspiracy based on circumstantial evidence. *See* Flex Br. 46 (arguing that Flex's complaint set forth "compelling circumstantial evidence"); 1-ER-7. Flex has not attempted to allege that there is any direct evidence of such a conspiracy. According to Flex's operative complaint, the Defendants-Appellees—a group of companies within the Panasonic, Sagami, and Sumida corporate families, hereinafter referred to as "Panasonic, Sagami, and Sumida"—along with several other defendants who are not before this Court, allegedly conspired to fix prices of inductors globally. Flex's claim against Panasonic, Sagami, and Sumida rests almost entirely on allegations that those companies exchanged pricing data and other information at industry conferences hosted by the Japan Electronics and Information Technology Industries Association (JEITA). But the "exchange of price data and other information among competitors . . . do[es] not constitute a *per se* violation of the Sherman Act." *United States v.*

2

*United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). So those allegations—standing alone—cannot be the basis of a per se conspiracy claim.

To be clear, Flex's claim is not that Panasonic, Sagami and Sumida violated the antitrust laws because they agreed to exchange information at JEITA meetings. Instead, Flex claims that the fact that these companies participated in meetings where information was exchanged proves that they conspired to fix prices. But Flex's theory is missing a crucial component: plausible factual allegations that show that defendants' prices were actually fixed. As the district court correctly determined when it dismissed Flex's third amended complaint, Flex not only "fail[ed] to allege information that Defendants actually charged higher prices and that they did so in parallel," but Flex did not even "dispute that it . . . failed to allege parallel [price-fixing] conduct." 5-ER-832.

Flex's fourth amended complaint—the operative complaint before this Court—fared no better: Although Flex engaged an economist to analyze the defendants' pricing data, that expert could not generate any plausible allegations of parallel pricing *involving Panasonic, Sagami, and Sumida*. Indeed, as the district court noted, the "price comparisons" set forth in the fourth amended complaint "do not show any trends, patterns, or relationships among the Defendants' pricing over time." 1-ER-8. And as to Flex's primary alleged "plus factor"—information-sharing at JEITA conferences—the district court, after carefully reviewing the

allegations, concluded that the fourth amended complaint did not "allege new facts showing that Defendants exchanged improper information at these meetings" or otherwise "demonstrating that the Panasonic, Sagami, and Sumida Defendants . . . conspired with the other named Defendants to fix the prices of inductors." *Id.*

On appeal, Flex devotes most of its argument to the notion that the district court misapplied antitrust pleading standards by demanding particularized allegations of parallel conduct with respect to inductor pricing. That argument is mistaken. As this Court has held, a plaintiff may state a circumstantial Section 1 price-fixing conspiracy claim only through plausible allegations of parallel conduct among the defendants and "plus factors" that are "largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Musical Instruments*, 798 F.3d at 1194; *see also, e.g.*, *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 390 (9th Cir. 2017). Here, Flex seeks to turn a "plus factor"—its allegations of information-sharing at JEITA—into the main event. But the point of plus factors is that they provide confirmation of "coordinated action," *Musical Instruments*, 798 F.3d at 1194, and Flex's complaint fails to state a claim because it lacks any plausible allegations of "coordinated action" between Panasonic, Sagami, and Sumida with respect to the prices of inductors.

Furthermore, allowing Flex past the motion-to-dismiss stage based on its allegations about information-sharing at JEITA—and without any plausible

4

allegations of parallel pricing—would run afoul of this Court's repeated warning that the exchange of "information about pricing and competition in [an] industry is standard fare for trade associations," and that "allow[ing] conspiracy to be inferred from such activities alone" would give rise to "an inference of conspiracy whenever a trade association took almost any action." *Musical Instruments*, 798 F.3d at 1196 (quoting *7-Up Bottling Co. of Jasper Inc. v. Archer Daniels Midland Co. (In re Citric Acid Litig.)*, 191 F.3d 1090, 1098 (9th Cir. 1999)). This Court's decision in *Musical Instruments*—which involved information-sharing allegations that are indistinguishable from the information-sharing allegations at issue here—squarely forecloses Flex's argument and disposes of this appeal.

Flex half-heartedly argues in the alternative that it *did* allege parallel conduct among defendants. First, Flex contends that the defendants' "exchanges of current and future price and production information" constituted parallel conduct. Flex Br. 55 (header). But, as pleaded by Flex, this is a price-fixing case, not an information-exchange case. If Flex's complaint sought to impose liability on the basis of information exchanges among the defendants, then it was required to plead that claim as a rule-of-reason claim. *See United States Gypsum Co.*, 438 U.S. at 441 n.16. Flex has pleaded this case as a per se *price-fixing* case. Accordingly, the parallel conduct it must allege in its complaint is parallel *pricing* conduct.

Second, Flex asserts that the district court erred by rejecting Flex's parallel-pricing allegations. But Flex misrepresents the district court's decision and fails to account for the weaknesses in Flex's allegations. Flex contends that the district court wrongly demanded statistically significant evidence of parallel pricing among Panasonic, Sagami, and Sumida. But the district court did not impose such a standard. It merely faulted Flex for having failed to "show any trends, patterns, or relationships among the Defendants' pricing over time." 1-ER-8. And that determination is left entirely unrebutted in Flex's opening brief. Flex criticizes the district court for "rejecting Flex's price comparisons for being not parallel enough," Flex Br. 61, but Flex makes no effort to show that it plausibly alleged any "trends, patterns, or relationships" among the prices charged by Panasonic, Sagami, and Sumida. That is because Flex has no answer to the district court's determination: none of the price comparisons it supplied in its fourth amended complaint suggested parallel pricing among Panasonic, Sagami, and Sumida.

After giving Flex multiple opportunities to cure these basic pleading deficiencies, the district court finally—and properly—dismissed Flex's fourth amended complaint with prejudice, and awarded judgment to Panasonic, Sagami, and Sumida. That judgment should be affirmed by this Court.

## STATEMENT OF THE CASE

### A.    The Market For Inductors And Preceding Litigation

Inductors are "passive electronic components that store and regulate energy in a circuit using principles of electromagnetism."  5-ER-645 (Fourth Am. Compl. ¶ 169).  Inductors come in many different forms:  they may be "as simple as wrapping a metal wire around some form of a core," and they "may also be encased, embedded, or molded in plastic cases or in discrete Inductor chips."  5-ER-648 (Fourth Am. Compl. ¶ 180).  They are generally "distinguished from one another by the material composing the 'core,' or the conductor for the magnetic reaction."  5-ER-649 (*id.* ¶ 182).  The "principal type[s] of inductors are air core inductors, iron core inductors, ferrite core inductors, toroidal core inductors, and multilayer inductors," and all of the defendants in this case "produce a variety of the various categories of inductors."  5-ER-645 (*id.* ¶¶ 184, 188).

Inductors are everywhere:  They are found in "charging devices, LCD televisions, LED lighting, consumer laptops, digital still cameras, smartphones, printers, game consoles, air conditioning systems and home appliances," as well as automotive "headlight circuitry, transmission systems, electronic control units, fuel systems, [and] navigation systems."  5-ER-650 (*id.* ¶ 190).  The price of different types of inductors can range from a fraction of a cent to well over a dollar, reflecting

this enormous variety of inductor types and uses.  *See* 5-ER-697–99 (*id.* ¶¶ 465-75); 5-ER-718 (*id.* ¶ 539).

It is estimated that in 2023 the global market for inductors will be worth over $3 billion.  5-ER-651 (*id.* ¶ 192).  Most inductors worldwide are manufactured by an array of Japanese firms, including the firms that were named as defendants in the district court proceedings below:  TDK Corporation, Murata Manufacturing Co., Taiyo Yuden Co., Panasonic Corporation (now Panasonic Holdings Corporation), Sagami Electronics Company, and Sumida Corporation.  *See* 5-ER-763–64 (*id.* ¶¶ 760-62).

In January 2018, the internet news source *MLex* published an article reporting that the Department of Justice had issued subpoenas to several unnamed companies—not the defendants before this Court—regarding an ongoing investigation into the potential price-fixing of inductors.  *See* 5-ER-780 (*id.* ¶¶ 851-52); 5-ER-808–09.  Soon thereafter, a putative class of plaintiffs who are direct purchasers of inductors filed a complaint against all of the above-named companies alleging that those companies had conspired to fix inductor prices in violation of Section 1 of the Sherman Act.  *See* 5-ER-809.  This putative class action, which was filed in the Northern District of California, was assigned to Judge Edward Davila, who would later preside over the instant case.  *See In re Inductors Antitrust Litig.*, No. 5:18-cv-00198-EJD (N.D. Cal. filed Jan. 9, 2018).

The district court dismissed the direct purchasers' class action for failure to state a claim, and rejected several bases for the class plaintiffs' claim that would later reappear in this case. First and foremost, the district court noted that the plaintiffs had "failed to allege parallel conduct" among the defendants regarding the "prices charged by . . . particular defendant[s]." 5-ER-809. Second, the district court turned away "general, vague, and conclusory" allegations concerning the defendants' "alleged participation in, and information exchanges at" meetings of the Japan Electronics and Information Technologies Association (JEITA), which were "alleged [to be] the principal means by which Defendants agreed to form a cartel." 5-ER-810. Third, the district court rejected the plaintiffs' argument that the inductor market was highly static and therefore uniquely conducive to conspiracy because, among other things, "hundreds of Chinese manufacturers entered the market during the relevant time period and Defendants lost market share." *Id.*

While this class action was pending, the class plaintiffs informed the district court that they had received information from one defendant, TDK, that it was an applicant for leniency through the Department of Justice's Antitrust Criminal Penalty Enhancement & Reform Act ("ACPERA") program, which (among other things) permits a leniency applicant to reduce its damages in a civil case by providing full information about unlawful conduct to civil plaintiffs. 5-ER-809; *see* U.S. Dep't of Justice, *Frequently Asked Questions About The Antitrust Division's Leniency*

9

*Program And Model Leniency Letters* at 18 (Jan. 26, 2017), https://www.justice.gov/atr/page/file/926521/download (explaining that a leniency applicant must "provid[e] the claimant with a full account of all potentially relevant facts known to the corporation or cooperating individual and all potentially relevant documents"). Pursuant to TDK's leniency application, TDK admitted that it had entered into bid-rigging agreements with *Murata* and *Taiyo Yuden* to "coordinate[ ] their activities and responses to bids" to specific purchasers of inductors." 5-ER-656 (Fourth Am. Compl. ¶ 229). These bid-rigging arrangements were designed to allow "Murata, TDK, and Taiyo Yuden [to] effectively protect[ ] their incumbent status as the inductor suppliers to large" inductor purchasers. 5-ER-658 (*id.* ¶ 242). TDK's proffer of information in connection with its leniency application did not state or suggest that it had conspired in any way—to rig bids or to fix prices—with Panasonic, Sagami, or Sumida. *See* 5-ER-780 (*id.* ¶¶ 851-52) (no Department of Justice (DOJ) subpoenas directed at Panasonic, Sumida, or Sagami); *see also In re Inductors Antitrust Litig.*, No. 5:18-cv-00198-EJD (N.D. Cal.), Dkt. 147-6 (DOJ confirmation in April 18, 2018 letter to Panasonic counsel that Panasonic not a subject of any inductors investigation).

### B.    Procedural Overview Of This Case

One member of the putative direct purchaser class, Flextronics International USA (Flex)—a California manufacturer of electronic products—opted out of the

10

class action. Instead, Flex filed an individual action (this case) against the same group of defendants in the Northern District of California (assigned to the same judge as the class action, Judge Davila), and its case was stayed while the motion to dismiss the class plaintiffs' complaint was adjudicated. 5-ER-808. Following dismissal of the class claims, the district court took up consideration of separate motions to dismiss Flex's third amended complaint submitted by (1) Murata, TDK, and Taiyo Yuden, and (2) Panasonic, Sagami, and Sumida. 5-ER-821.

In considering these motions to dismiss, the district court noted that Flex alleged "two distinct types of price-fixing agreements." 5-ER-822. The first was a "broad directional agreement" between "all Defendants to fix current and future pricing levels" for inductors globally. *Id.* The second was a "specific price agreement between the Murata, TDK, and Taiyo Yuden Defendants to target Original Equipment Manufacturers' ('OEM') supply chains by rigging bids and implementing specific prices." *Id.* The district court recognized that "the allegations about the OEM-conspiracy show that Murata, Taiyo Yuden, and TDK Defendants conspired to fix the price of Inductors as to" a particular customer, known as "Customer C." 5-ER-823. But the district court concluded that Flex "lack[ed] standing to bring claims premised on the alleged [bid-rigging] agreements aimed at Customer C," because Flex's third amended complaint "neither alleges that [Flex] or its affiliates purchased the parts allegedly affected by OEM-specific bid-rigging

agreements nor that Plaintiff was a target of the alleged scheme." 5-ER-825. And as to Flex's distinct allegation that "all Defendants" had conspired to "fix current and future pricing levels" for inductors, the district court dismissed the complaint for failure to state a claim, for reasons discussed further below. The district court accordingly granted the separate motions to dismiss submitted by Murata, TDK, Taiyo Yuden, and by Panasonic, Sagami, and Sumida. 5-ER-833. But the district court allowed Flex over a month to file another amended complaint to attempt to "cure the deficiencies addressed in this Order." 5-ER-838.

In the meantime, Flex agreed to dismiss its claims against the Murata, TDK, and Taiyo Yuden Defendants, whom TDK disclosed as having engaged in bid rigging. 5-ER-823; *see* 3-ER-369 (Dkt. 193) (July 29, 2021 stipulated dismissal order as to TDK); 3-ER-370 (Dkt. 202) (Dec. 16, 2021 stipulated dismissal order as to Murata); 3-ER-370 (Dkt. 205) (Jan. 5, 2022 stipulated dismissal order as to Taiyo Yuden). Thus, by the time the district court granted the motion to dismiss Flex's fourth amended complaint, the only defendants left in the *Flex* case were the Panasonic, Sagami, and Sumida defendants—who had *not* been implicated in TDK's leniency proffer and who were not involved in the bid-rigging scheme involving TDK, Murata, and Taiyo Yuden. *See* 5-ER-656 (Fourth Am. Compl. ¶ 229).

### C.     Flex's Operative Allegations Against Appellees

In its fourth, operative complaint, Flex set forth a host of particularized allegations regarding the misconduct of TDK, Murata, and Taiyo Yuden, as well as a more limited set of allegations regarding Panasonic, Sagami, and Sumida.  As to the first group of defendants, the complaint set forth specific allegations concerning the origin and mechanics of those defendants' bid-rigging scheme, orchestrated through informal "Nakakabu meetings" at which "TDK, Murata, and Taiyo Yuden agreed to refrain from seeking the others' business if one of them had sufficient production capacity to supply its customer."  5-ER-678 (Fourth Am. Compl. ¶ 371). Flex's fourth amended complaint also provided extensive evidence of parallel price movements among TDK, Murata, and Taiyo Yuden as to specific inductor products. 5-ER-713–17 (*id.* ¶¶ 524-34).

As to the Defendants-Appellees (Panasonic, Sagami, and Sumida) who are before this Court, however, Flex's allegations focused on the defendants' participation in JEITA trade-association meetings.  *See, e.g.*, 5-ER-705 (*id.* ¶ 493) (alleging that "[a]t least 60 members from Defendant companies attended Inductors Subcommittee-related meetings" at JEITA); 5-ER-708 (*id.* ¶ 498) (alleging that "current and forward-looking information on sales, prices, shipments, product development, and capacity" was discussed at these meetings); 5-ER-720 (*id.* ¶ 548) (same); 5-ER-722 (*id.* ¶ 562) (noting that JEITA "surveyed its members regarding

past sales, current sales, and projected sales").[1]  Unlike its allegations regarding TDK, Murata, and Taiyo Yuden, Flex's claim concerning Panasonic, Sagami, and Sumida did not set forth extensive factual allegations of parallel price movements over time, *see* 5-ER-717–18 (*id.* ¶¶ 535-39), nor did Flex supply any specific allegations of meetings (such as the Nakakabu meetings between the other defendants) at which Panasonic, Sagami, or Sumida agreed to set prices or rig bids in collusion with competitors.

### D.   Decisions Below

In its order dismissing Flex's third amended complaint, the district court recognized that Flex's price-fixing claim against the Panasonic, Sagami, and Sumida defendants—as distinguished from its bid-rigging allegations concerning TDK, Murata, and Taiyo Yuden—rested on a purely "circumstantial [theory] of . . . conspiracy." 5-ER-832.  The district court further observed, as a general matter, that "plaintiffs attempting to plead a conspiracy based on circumstantial evidence must allege both parallel conduct and 'plus factors' that demonstrate that the conduct is the result of conspiracy and not independent action."  *Id.*  And the district court concluded that Flex's third amended complaint failed to state a claim against Panasonic, Sagami and Sumida because it "failed to allege parallel conduct" among

---

[1]   Flex retracted its complaint's association of Sagami with a JEITA participant named "Mr. Suzuki," 3-ER-367 (Dkt. 177); *cf.* 5-ER-760 (Fourth Am. Compl. ¶ 691-92), but its brief repeats the error (at 29-30).

those defendants; that is, it did not "allege information that Defendants actually charged higher prices and that they did so in parallel." *Id.* Furthermore, the district court noted that the "plus factors" identified by Flex—primarily the information-sharing that allegedly took place at JEITA—were "dubious," since they "recite[d] . . . facts that the Court already determined [a]re insufficient." 5-ER-833; *see also* 5-ER-810 (recounting the determination from the class-action suit that "participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement" (citation omitted)).

On consideration of Flex's fourth amended complaint, the district court concluded that Flex had not resolved these pleading deficiencies. 1-ER-7. First, the district court observed that Flex "fail[ed] to plead parallel pricing among the Panasonic, Sagami, and Sumida Defendants," *id.*, because even though Flex had sought to use "price comparisons" involving "pairs of Defendants," those price comparisons "do not show any trends, patterns, or relationships among the Defendants' pricing over time," 1-ER-8. Second, the district court determined that the complaint failed "to allege how the Panasonic, Sagami, and Sumida Defendants 'joined [a] conspiracy and played some role in it.'" *Id.* (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008)). The district court noted that the operative complaint "alleges that the Panasonic, Sagami, and Sumida Defendants participated in the JEITA meetings," but reiterated that "the

Ninth Circuit has clearly stated that 'mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.'" *Id.* (quoting *Musical Instruments*, 798 F.3d at 1196). Because Flex failed to "allege new facts showing that Defendants exchanged improper information at those meetings," there were "no allegations demonstrating that the Panasonic, Sagami, and Sumida Defendants behaved improperly or conspired with the other named Defendants to fix the prices of inductors." *Id.* The district court accordingly dismissed Flex's fourth amended complaint for failure to state a claim. *See id.*

## SUMMARY OF ARGUMENT

The district court correctly dismissed Flex's fourth amended complaint for failure to state a claim. That decision should be affirmed by this Court.

A. First, the district court correctly concluded that Flex failed to state a plausible circumstantial price-fixing claim against Panasonic, Sagami, and Sumida in the absence of plausible allegations that Panasonic, Sagami, and Sumida actually engaged in parallel pricing. As this Court and others have explained repeatedly, the standard approach to stating a circumstantial claim under Section 1 of the Sherman Act is through allegations that the defendants engaged in parallel conduct, in addition to "plus factors" plausibly indicating that that parallel conduct was the result of interdependent collusion rather than independent action. Flex contends that "plus

16

factors," standing alone, may suffice to establish a Section 1 claim. But there is no support in this Court's case law for that argument. And even if it could work in the abstract, the argument clearly fails here, since it is well established that allegations of information-sharing at trade-association meetings (such as the JEITA meetings at issue in this case) cannot—on their own—establish a per se price-fixing claim under Section 1. *See, e.g.*, *Musical Instruments*, 798 F.3d at 1196. Indeed, the information-sharing allegations set forth in Flex's operative complaint present the same kinds of allegations that this Court previously found deficient in *Musical Instruments*. *See infra* at 29-30. *Musical Instruments* is controlling here. Flex's information-sharing allegations fail to state a plausible claim of price-fixing.

B.    Given all of this, Flex—at the bare minimum—needed to augment its complaint with plausible allegations of parallel pricing among the Panasonic, Sagami, and Sumida defendants. Flex resists that premise by asserting that it plausibly alleged parallel conduct in the form of parallel information-sharing. That argument fails. The *only* claim Flex asserts in this case is a price-fixing claim. Flex does not assert that defendants violated the antitrust laws by agreeing to share information, a different claim that would be subject to an entirely different legal standard, for which Flex does not even attempt to plead the elements. Flex has consistently made clear that it is pursuing a per se price-fixing conspiracy claim. Allowing Flex to recast its information-sharing allegations as "parallel conduct"

sufficient to state a conspiracy claim would ignore and undermine the settled rule that information-sharing is not itself unlawful. In order to proceed on its price-fixing claim here, Flex needed to allege parallel *pricing*. And Flex's unconvincing attempt to argue that it sufficiently did so only underscores the weaknesses of its allegations.

C.     Finally, Flex's passing effort to buttress its case based on allegations concerning the inductor market and Panasonic in particular likewise fails. Flex's allegations concerning the inductor market do not suggest a market that was uniquely susceptible to price-fixing; on the contrary, they show that the market was characterized by active competition involving Sumida (which aggressively grew its market share vis-à-vis the TDK, Murata, and Taiyo Yuden defendants over the course of the alleged conspiracy period), along with a host of successful new Chinese entrants. In addition, Flex's Panasonic-specific argument is not responsive to the district court's reasoning, and it provides no basis for reversing its judgment.

The district court's judgment should be affirmed.

## STANDARD OF REVIEW

This Court reviews de novo a district court's order granting a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 652 (9th Cir. 2019). Such an order will be affirmed "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Los*

*Angeles Lakers, Inc. v. Federal Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (quoting

*Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010)).

"To survive a motion to dismiss, the complaint 'must contain sufficient factual

matter, accepted as true, to "state a claim to relief that is plausible on its face."'"

*Depot*, 915 F.3d at 652 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "And

although '[this Court] accept[s] as true all factual allegations,' [it] do[es] not 'accept

as true allegations that are conclusory.'" *Id.* at 653 (quoting *Cohen v. NVIDIA Corp.*

*(In re NVIDIA Corp. Sec. Litig.)*, 768 F.3d 1046, 1051 (9th Cir. 2014)).

## ARGUMENT

### I. THE DISTRICT COURT PROPERLY DISMISSED FLEX'S FOURTH AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM

#### A. The District Court Correctly Recognized That Flex's Information-Sharing Allegations Did Not Plausibly State A Price-Fixing Claim In The Absence of Parallel-Pricing Allegations

##### 1. *In Circumstantial Price-Fixing Cases, Plaintiffs Must Generally Plead Parallel Pricing And "Plus Factors"*

The pleading standards governing this case are well-settled. A plaintiff

asserting a horizontal price-fixing claim in violation of Section 1 can state a claim

in one of two ways. The first is to allege "direct evidence" of a price-fixing

conspiracy, such as "a recorded phone call in which two competitors agree to fix

prices at a certain level." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709

F.3d 129, 136 (2d Cir. 2013); *see, e.g.*, *In re GSE Bonds Antitrust Litig.*, No. 19-CV-

1704, 2019 WL 5791793, at *2 (S.D.N.Y. Oct. 15, 2019) (denying motion to dismiss

19

where the plaintiffs' third amended complaint "add[ed] nineteen new purported chatroom transcripts . . . [that] show traders . . . apparently agreeing to fix . . . prices for newly issued GSE bonds"); *Kjessler v. Zaappaaz, Inc.*, No. 4:18-cv-0430, 2019 WL 3017132, at *11 (S.D. Tex. Apr. 24, 2019) (denying motion to dismiss where the "[c]omplaint contains text and social media platform conversations where [conspirators] admit to the cartel's existence and implicate each other").

The second is to allege "circumstantial facts supporting the *inference* that a conspiracy existed." *Citigroup*, 709 F.3d at 136. A conspiracy "may be inferred on the basis of conscious parallelism [among the conspirators], when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Id.* (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.)). As this Court has explained, when a complaint rests on allegations of circumstantial evidence, "[p]lus factors *coupled with parallel conduct* can take a complaint from merely possible to plausible." *Ramsey v. National Ass'n of Music Merchs., Inc. (In re Musical Instruments & Equip. Antitrust Litig.)*, 798 F.3d 1186, 1194 n.7 (9th Cir. 2015) (emphasis added). One "plus factor" recognized by courts is a pattern of "[i]nformation exchange" among alleged conspirators. *Todd*, 275 F.3d at 198; *see also, e.g.*, *Musical Instruments*, 798 F.3d at 1196 (discussing "participation in trade-organization meetings where information is exchanged and

strategies are advocated" as an asserted "plus factor"); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628-29 (7th Cir. 2010).

Thus, it is well-settled that a plaintiff who pleads a Section 1 claim on the basis of circumstantial allegations must generally allege *both* parallel conduct *and* certain "plus factors" that add up to a plausible allegation of conspiracy. "For a § 1 claim to survive [a motion to dismiss], a plaintiff must plead parallel conduct *and* something 'more.'" *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). As this Court has recognized, a complaint that alleges only certain "plus factors" will not make out a viable Section 1 claim, since "'[p]lus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants." *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) (citing *Musical Instruments*, 798 F.3d at 1193-94). Where a plaintiff "has not plausibly alleged any parallel conduct among the defendants," the complaint fails as a matter of law. *Id.*; *see also Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) ("Because [plaintiff] fails to plausibly plead parallel conduct, no discussion of any 'plus factors' is necessary. The district court correctly dismissed [plaintiff's] Section 1 claim."); *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564 n.18 (11th Cir. 1998) ("[I]n order to prevail on their claim

of the existence of a price-fixing conspiracy without direct evidence, the plaintiffs must show . . . that the defendants acted in a consciously parallel fashion.").

The district court correctly applied these settled pleading principles here. As the court explained in addressing Plaintiff's fourth amended complaint, "[w]ithout direct evidence of a market-wide conspiracy, Plaintiff must plead circumstantial evidence of a conspiracy," and such a theory must rest on allegations of "both parallel conduct and 'plus factors' that demonstrate that the conduct is the result of conspiracy and not independent action." 5-ER-832.[2]

Flex argues that the district court erred by demanding plausible allegations of parallel conduct. In Flex's view, there are "no hard and fast rules governing the substance of [antitrust] plaintiffs' allegations," and a complaint "should therefore be sustained if the allegations therein, whatever their substance, plausibly allege a conspiracy." Flex Br. 41-42. Flex thus suggests that its allegations regarding information-sharing at JEITA conferences did not need to be supplemented by

---

[2] There can be no doubt that Flex has always pursued a *circumstantial* price-fixing claim in this case. As it acknowledged in its operative complaint, it has not alleged that there are any "written records" of price-fixing here, 5-ER-745 (Fourth Am. Compl. ¶ 661), and its complaint has consistently emphasized the existence of "plus factors" that, "when viewed collectively," allegedly "support an *inference* that Defendants engaged in collusive activity," 5-ER-616 (*id.* ¶ 36) (emphasis added). And Flex has made no argument before this Court that its claim should properly be analyzed as a direct-evidence claim.

plausible allegations of parallel pricing. *See id.* at 48-55 (asserting that the defendants' conduct at JEITA meetings plausibly suggested a conspiracy).

That is incorrect. As explained below, courts have consistently recognized that information-sharing at trade association meetings on its own does not plausibly suggest a price-fixing conspiracy, and is (at most) a "plus factor" that would plausibly suggest a conspiracy in concert with parallel-pricing allegations. *See, e.g.*, *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 14 (1st Cir. 2016); *Musical Instruments*, 798 F.3d at 1196; *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628; *Tam Travel, Inc. v. Delta Airlines, Inc. (In re Travel Agent Comm'n Antitrust Litig.)*, 583 F.3d 896, 911 (6th Cir. 2009).

Thus, in the context of this case, Flex could not plead a plausible circumstantial case on the basis of information-sharing at JEITA—which is at best a mere "plus factor." It needed to supply plausible allegations of parallel pricing, too. *See Musical Instruments*, 798 F.3d at 1194 n.7 ("Plus factors *coupled with parallel conduct* can take a complaint from merely possible to plausible." (emphasis added)); *see also Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig. v. Samsung Elecs. Co. (In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.)*, 28 F.4th 42, 53 (9th Cir. 2022) (noting that, while "'circumstantial evidence is the lifeblood of antitrust law,'" a "single plausible plus factor allegation that weakly tips in the plaintiffs' favor, without some

further factual support, is not enough to open the floodgates to discovery in antitrust cases" (citation omitted)).

Flex does not cite *any* precedent suggesting that its price-fixing conspiracy claim could go forward in this circumstance without plausible allegations of parallel pricing. And Defendants are not aware of any such precedent. Instead, Flex cites (at 42) a set of four inapposite district court decisions for the proposition that there are different ways to plead a plausible price-fixing claim. But those cases are readily distinguishable. One of the cases actually involved plausible parallel pricing allegations. *See In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1062 (N.D. Cal. 2015) ("[T]he complaint alleges—with specific price data—that defendants' 'concerted and collusive actions . . . artificially inflated the prices of capacitors . . . .'" (alteration in original) (citation omitted)). And two involved "direct allegations of price fixing." *In re Resistors Antitrust Litig.*, No. 15-cv-03820, 2017 WL 3895706, at *3 (N.D. Cal. Sept. 5, 2017); *see also Hogan v. Cleveland Ave Rest. Inc.*, No. 2:15-CV-2883, 2018 WL 1475398, at *4 (S.D. Ohio Mar. 26, 2018) (holding that plaintiff "need not even show parallel conduct or plus factors" when the plaintiff alleges a "direct, explicit 'industry agreement' to employ a price-fixing contract (a copy of which is already in the record)"). Thus, three of the cases are clearly inapposite, since Flex's claim is admittedly built on circumstantial, not direct,

allegations of conspiracy. *See, e.g.*, Flex Br. 46 (describing Flex's case as resting on "compelling circumstantial evidence").

As for the remaining case invoked by Flex, the district court granted the defendants' motion for summary judgment in that case precisely because "Plaintiffs' *per se* § 1 claim is seriously weakened . . . by the absence of evidence of parallel conduct," and it "surely is more difficult to arrive at a reasonable inference of collective wage-fixing if the Defendant[] hospitals did not, in fact, engage in parallel conduct or reach parallel results in their compensation decisions." *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 640 (E.D. Mich. 2012).

That is exactly the point here: Where a plaintiff cannot show that the defendants "engage[d] in parallel conduct," it is "surely . . . more difficult to arrive at a reasonable inference" of conspiracy on the basis of circumstantial evidence. *Id.* That is why parallel-pricing allegations are generally a core component of any successful price-fixing claim built on circumstantial allegations of misconduct. The district court below did not err in determining that Flex's complaint failed to raise a plausible inference of a price-fixing conspiracy where it failed to allege facts that plausibly suggest prices were actually fixed.

2. *Antitrust Plaintiffs May Not Rest A Price-Fixing Complaint Solely On Allegations Of Information-Sharing At Trade Association Meetings*

Flex's argument fails for an even more fundamental reason. Even assuming that *some* antitrust plaintiffs could state a circumstantial case of price-fixing without including allegations of parallel pricing, that rule would not save Flex's complaint here because the *only* particularized allegations supporting Flex's claim against Panasonic, Sagami, and Sumida are allegations about information-sharing at JEITA meetings. *See, e.g.*, Flex Br. 47 (citing alleged exchange of "current and future price, production, and capacity information"); *id.* at 48 (discussing the exchange of "revenue metrics and projections, and discuss[ions of] conditions impacting the U.S. market"). And binding authority in this Circuit makes clear that "participation in trade-organization meetings where information is exchanged"—including "'information about pricing and competition in the industry'"—does not, on its own, "suggest an illegal agreement." *Musical Instruments*, 798 F.3d at 1196 (quoting *7-Up Bottling Co. of Jasper Inc. v. Archer Daniels Midland Co. (In re Citric Acid Litig.)*, 191 F.3d 1090, 1098 (9th Cir. 1999)).

Precedent from other circuits is in accord. *See, e.g.*, *Evergreen Partnering Grp.*, 832 F.3d at 14; *see also Twombly*, 550 U.S. at 567 n.12. Indeed, numerous cases cited by Flex in its opening brief recognize as much. *See In re Text Messaging Antitrust Litig.*, 630 F.3d at 628 (exchanging price information is a practice that

26

sometimes "facilitates price fixing," but is "not illegal in itself"); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1148 (N.D. Cal. 2009) ("Plaintiffs' allegations regarding trade organizations and trade meetings, *standing alone*, may not state a claim under the Sherman Act . . . ." (emphasis added)); *Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 164 (W.D.N.Y. 2020) (noting that allegations of trade-association information exchanges do not establish conspiracy, but that allegations of "participation in a trade association, where Defendants had opportunities to exchange information or make agreements, *coupled with allegations of parallel conduct* . . . , are sufficient" (emphasis added) (citation omitted)).

Flex stresses that in this Court's decision in *Citric Acid*, the plaintiff had alleged only the exchange of "aggregated information" about production and sales through a trade association, whereas this case involves the exchange of "individual price and production information." Flex Br. 49-50 (emphasis omitted). But this Court's more recent decision in *Musical Instruments* recognized that information-sharing through trade associations is not sufficient on its own to state a Section 1 claim, even when the information exchanged includes "confidential cost, pricing, and other business information." Appellants' Opening Br. 3, *In re Musical Instruments & Equip. Antitrust Litig.*, No. 12-56674 (9th Cir. Feb. 5, 2013), ECF No. 28; *see also id.* at 4, 20, 24.

If anything, the information-sharing allegations at issue in *Musical Instruments* were much more suggestive of a price-fixing conspiracy than the allegations at issue here. In *Musical Instruments*, the plaintiffs alleged that the defendants had all simultaneously adopted "minimum advertised price policies" (or "MAPs") over a three-year period, and that those policies all carried the same terms across different firms. *See id.* at 40-42. The plaintiffs' allegations focused on the fact that the defendants had used their trade-association meetings to "discuss[ ] the terms and enforcement of MAPs, wholesale and retail prices, and profit margins." *Id.* at 42. They also alleged that, at such trade association meetings, leading industry figures worked from "talking points" in order "to 'ensure' that they were 'on the same page'" with respect to MAP policies. *Id.* at 42-43 (citation omitted). And in "discuss[ing] strategies for implementing, revising and enforcing MAPs," the defendants "exchanged cost and pricing information." *Id.* at 24. These allegations were joined to allegations that market prices actually shifted higher as a result of the defendants' MAPs. *Id.* at 25-27. Furthermore, following a government investigation, the Federal Trade Commission (FTC) concluded that the defendants had "exchanged information on competitively-sensitive subjects" at the trade-association meetings, and that the meetings "crossed the line that distinguishes legitimate trade association activity from unfair methods of competition," thereby "facilitat[ing] the implementation of collusive strategies." *Id.* at 4.

Notwithstanding all of this, however, this Court recognized that the information-sharing allegations presented by the *Musical Instruments* plaintiffs "d[id] not suggest an illegal agreement." 798 F.3d at 1196. *A fortiori,* the same result follows here as to Flex's much weaker allegations regarding information-sharing at JEITA.

Flex attempted to distinguish *Musical Instruments* in its complaint, but in doing so it only highlighted how indistinguishable this Court's decision in *Musical Instruments* is. *See* 5-ER-737–38 (Fourth Am. Compl. ¶¶ 618-24) (noting, for example, that only "four hundred companies are members of JEITA," as against "9,000 member companies" in the trade-association at issue in *Musical Instruments*). For instance, Flex alleged that its case is distinguishable because Defendants "kept the information sharing at JEITA meetings confidential and limited to internal use only," and also "shared confidential information outside the formal meetings." 5-ER-738 (*id.* ¶ 622). But the same was true in *Musical Instruments*. *See Musical Instruments* Appellants' Opening Br. 24 (noting that defendants "exchanged cost and pricing information" at a "series of non-public and 'invitation only' summits" (citation omitted)).

Flex also asserted that the information exchanges in *Musical Instruments* were never deemed "potentially problematic from an antitrust perspective." 5-ER-738 (Fourth Am. Compl. ¶ 623). But that is incorrect. The plaintiffs in *Musical*

29

*Instruments* stressed in their briefs to this Court that the FTC thought the meetings at issue "crossed the line that distinguishes legitimate trade association activity from unfair methods of competition," and potentially "facilitat[ed] the implementation of collusive strategies." *Musical Instruments* Appellants' Opening Br. 4 (citation omitted). No government antitrust enforcer has drawn similar conclusions about the JEITA information-sharing in which Panasonic, Sagami, and Sumida participated. Notably, Flex has abandoned these arguments in its opening brief. *Musical Instruments* squarely governs this case, and alone compels affirmance.

Flex also discusses a few authorities standing for the proposition that "exchanges of future price information are considered especially anticompetitive." Flex Br. 51 (quoting *Todd v. Exxon Corp.*, 275 F.3d at 211). But those authorities deal with claims in which the relevant anticompetitive conduct (i.e., the subject of the antitrust claim) is the *information-sharing itself*. *See Todd*, 275 F.3d at 198 (describing an "analytically distinct type of claim . . . where the violation lies in the information exchange itself—as opposed to merely using the information exchange as evidence upon which to infer a price-fixing agreement"). These types of claims are governed by rule-of-reason analysis because information-sharing is not unlawful per se. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *Todd*, 275 F.3d at 199; FTC & DOJ, *Antitrust Guidelines for Collaborations Among Competitors* at 10, 15 (Apr. 2000), https://www.ftc.gov/sites/default/files/

documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf (analyzing "[a]greements that . . . involve the exchange or disclosure of information" as agreements subject to the rule of reason). Flex is not pleading a rule-of-reason claim grounded in an agreement to exchange information. Instead, it has sought to use the alleged information exchanges to support a per se price-fixing claim. Accordingly, cases like *Todd* that address "analytically distinct" information-sharing claims, 275 F.3d at 198, are inapposite.

### 3. *Flex's Allegations Concerning The Participation Of Panasonic, Sagami, And Sumida Executives In JEITA Meetings Do Not Raise A Plausible Inference Of Conspiracy*

Even setting aside the binding Ninth Circuit case law that forecloses Flex's theory in this case, Flex's complaint more fundamentally fails to state a claim because the inferences Flex asks the court to draw from its allegations are simply not "plausible on [their] face." *Twombly*, 550 U.S. at 570.

Flex argues, for instance, that Sagami must have been a conspirator in a price-fixing conspiracy because it told its competitors at JEITA that it was "struggling in handling the steep rises in the price of materials and the environment." Flex Br. 54 (quoting 5-ER-747). According to Flex, a "genuine competitor" would never make such an admission. *Id.* But corporate executives routinely tell the whole world (on corporate earnings calls, for example) that they are hitting headwinds or struggling

31

with high input costs. *See, e.g.*, PR Sanjai & Debjit Chakraborty, *Reliance's Profit Misses Estimates as High Input Costs Bite*, Bloomberg (July 22, 2022), https://bloom.bg/3RdsXqc (noting that "Chief Financial Officer V. Srikranth told an earnings call" that Reliance was "impacted by higher energy cost and oil prices"); Lee Bridgett, *Mixed Impacts Across the Food Sector as Inflation Hits Consumer Spending*, S&P Global, IHS Markit (Aug. 1, 2022), https://ihsmarkit.com/research-analysis/mixed-impacts-across-the-food-sector-as-inflation-hits.html (noting that Coca-Cola's second-quarter earnings for 2022 reported "higher operating costs as well as a significant impact from 'currency headwinds'"). Such corporate acknowledgments of basic business realities are hardly indicia of collusion.

Nor does Flex gain any traction from its argument (at 48) that discussion of "revenue metrics and projections" and "conditions impacting the U.S. market" constitutes plausible evidence of price-fixing. Again, corporations regularly share their reactions to market conditions—and their revenue projections and plans for the future—with the public at large. *See, e.g.*, CNBC, *American Airlines Forecasts Third-Quarter Profit But Scales Back Growth After Flight Disruptions* (July 21, 2022), https://cnb.cx/3KvCPJY ("For the third quarter Alaska [Airlines] plans to fly a schedule down 5% to 8% compared with the same period of 2019 and expects revenue up as much as 19% over three years earlier."). This allegation is not suggestive of any antitrust conspiracy, much less sufficient to state a claim.

To the contrary, as this Court has recognized repeatedly, gathering and distributing this kind of "information about pricing and competition in the industry is standard fare for trade associations," and is a necessary aspect of those associations' "legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services." *Musical Instruments*, 798 F.3d at 1196 (quoting *In re Citric Acid*, 191 F.3d at 1098). It is, for example, difficult for industry groups to lobby public officials effectively unless they have a clear understanding of specific aspects (including the negative aspects) of their members' business outlooks. *See, e.g.*, *The Unintended Consequences of Increased Steel Tariffs on Am. Mfrs.: Hearing Before the H. Comm. on Small Bus.*, 107th Cong. 229-34 (2002) (submission by trade association regarding members' survey responses to the immediate business effects of steel tariffs, including "vulnerab[ility] to . . . price hikes and supply shortages," "smaller profit margins," and even "company viability").

Flex tried to strengthen its complaint by including the makeweight allegations of an expert (Dr. Russell Lamb), who allegedly reviewed the JEITA information exchanges and determined that these exchanges "were more consistent with collusion than lawful independent behavior." Flex Br. 54. But the determination that certain allegations give rise to a plausible inference of collusive conduct is a

legal conclusion for the courts, and expert opinions as to "legal conclusions" have no place at any stage of a legal proceeding. *See United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (noting that an expert witness "cannot give an opinion as to her *legal* conclusion" (citation omitted)). And it is a core principle of the *Twombly/Iqbal* pleading standard that courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Here, the fact that Dr. Lamb reviewed certain information exchanges and determined in a summary fashion that those exchanges were "anticompetitive," 5-ER-614 (Fourth Am. Compl. ¶ 29), cannot push Flex's allegations across the plausibility threshold. For that reason, Flex's insistence (at 53) that the district court erred by "failing to credit Dr. Lamb's opinion" is meritless. Dr. Lamb's allegations were entirely conclusory, and the district court's decision not to credit those allegations was correct.

Flex also argues that the district court could properly infer a Sherman Act violation from the complaint's allegation that Panasonic's own employee, Hitoshi Takiguchi, "admitted that the JEITA 'information exchanges' would now be 'acknowledged as a compliance violation.'" Flex Br. 54-55 (quoting 5-ER-740–41 (Fourth Am. Compl. ¶ 635)). But as Flex's own allegations indicate, Mr. Takiguchi was referring to a violation of *Panasonic*'s internal policies, which forbade all "[a]greements *and exchanges of information* with competitors regarding prices,

34

quantity and other competition-related matters." 5-ER-741 (Fourth Am. Compl. ¶ 637) (emphasis altered).[3] The district court correctly held that the fact that "the information exchanged may have violated a [Panasonic] compliance policy does not show an . . . agreement to fix the prices *of Inductors*" in violation of the Sherman Act. 5-ER-831 (citing *Havensure, L.L.C. v. Prudential Ins. Co. of Am.*, 595 F.3d 312, 317 (6th Cir. 2010) (noting "a violation of internal policies" does not "suffice[ ] to render . . . conduct wrongful")). Flex claims (at 55) that the district court "disregard[ed] these allegations," but it does not rebut the district court's reasoning on this point, and it is hard to see how it could: violations of internal company information-sharing policies that are more strict than the Sherman Act do not equate

---

[3] It is also noteworthy that the internal Panasonic policy referred to in the Fourth Amended Complaint is a "fair-trade policy" relating to "fair trade law." 5-ER-741 (Fourth Am. Compl. ¶¶ 636-37). Flex does not allege that this policy derived from Panasonic's views regarding the requirements of *U.S. antitrust law*, and it can fairly be inferred from the pleading that this policy was instead rooted in Panasonic's views of the requirements of *Japanese* competition law, enforced by the Japan Fair Trade Commission. *See, e.g.*, Colin P.A. Jones, Book Review, *How Compliance Is Ruining Japan*, 23 Conn. J. Int'l L. 197, 198-99 (2007) (reviewing Nobuo Gohara, *Legal Compliance Will Destroy Japan* (2007)) (describing the enforcement role of the JFTC). Flex's allegations relating to Panasonic's view of Japanese trade law do not plausibly suggest a violation of the Sherman Act; indeed, even substantial allegations of a violation of foreign antitrust law do not plausibly suggest a violation of U.S. antitrust law. *See, e.g.*, *In re German Auto. Mfrs. Antitrust Litig.*, ___ F. Supp. 3d ___, 2020 WL 1542373, at *4 (N.D. Cal. Mar. 31, 2020), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022).

to—or even plausibly suggest—a price-fixing conspiracy in violation of the Sherman Act.

**B.    The District Court Correctly Recognized That Flex's Parallel-Pricing Allegations Were Deficient**

Flex also tries to save its case by half-heartedly arguing, in the alternative, that it *did* sufficiently allege parallel conduct in two different forms:  (1) parallel information exchanges, and (2) parallel pricing.  That argument fails on both counts.

*1.    Flex's Information-Exchange Allegations Are Not Sufficient Parallel Conduct To State A Price-Fixing Conspiracy Claim*

Flex first argues that it adequately alleged parallel conduct by alleging that "Defendants agreed to meet and reciprocally exchange secret current and future pricing, production, and capacity plans."  Flex Br. 56.

That argument lacks merit.  The theory presented in Flex's complaint is that Defendants *fixed the prices of inductors*.  *See* 5-ER-610 (Fourth Am. Compl. ¶ 9) ("Defendants conspired to fix, raise, stabilize, and maintain the price of inductors . . . at supra-competitive levels.").  In order to sufficiently allege a price-fixing conspiracy, Flex had to plead allegations that plausibly suggest that Defendants conspired with each other to fix prices.  "Parallel conduct" in the form of *parallel pricing*, together with plus factors, could have sufficed.  *See In re Citric Acid*, 191 F.3d at 1102.  But Flex cannot state a price-fixing claim by pointing to "parallel conduct" in the form of information-sharing.  In a price-fixing case, information-

sharing through a trade association is a "plus factor"; it is not the main event. *See, e.g.*, *Musical Instruments*, 798 F.3d at 1194, 1196-97 (analyzing "participation in trade-organization meetings where information is exchanged" as a potential "plus factor"); *see also* 5-ER-613 (Fourth Am. Compl. ¶¶ 26-27) (alleging that Defendants' "exchange [of] detailed future supply, demand, and price information" constituted a "plus factor[ ]" supporting Flex's claim).

Treating information-sharing at JEITA as the relevant parallel conduct in this case would work only if Flex had presented a rule-of-reason claim that Defendants entered an agreement to engage in reciprocal information-sharing, which agreement *itself* constituted an agreement in restraint of trade in violation of the Sherman Act. *See, e.g.*, *Todd*, 275 F.3d at 198 (describing a "type of claim . . . where the violation lies in the information exchange itself"). Flex never presented a rule-of-reason claim alleging that the information exchanges *themselves* amounted to a Sherman Act violation. Instead, Flex has always characterized the alleged conspiracy in this case as a conspiracy to "fix . . . the price of inductors." 5-ER-610 (Fourth Am. Compl. ¶ 9). That is how the district court—correctly—understood Flex's claim. *See, e.g.*, 5-ER-820; 1-ER-6. And Flex has never presented any of the necessary aspects of a rule-of-reason claim (such as particularized allegations regarding the scope of the relevant market or the anticompetitive effects of any information exchanges) in its complaint or before the district court or this Court. It has waived such arguments.

Indeed, allowing Flex to state a per se conspiracy claim based solely on information exchanges would give antitrust plaintiffs an obvious end-run around the rule that information exchanges are not illegal per se, since the "exchange of price data and other information among competitors does not invariably have anticompetitive effects." *United States Gypsum Co.*, 438 U.S. at 441 n.16; *see also Todd*, 275 F.3d at 199. This Court has always treated information-exchange allegations or evidence as a sufficient circumstantial basis for a price-fixing claim only in concert with plausible allegations or evidence of parallel pricing conduct. As this Court explained years before the Supreme Court's landmark *Twombly* decision, in circumstantial price-fixing cases, "[a]dditional proof beyond mere parallel pricing usually is required," and "information exchanges [can] help to establish an antitrust violation . . . when . . . the exchange indicates the existence of an express or tacit agreement to fix or stabilize prices." *Arizona v. Standard Oil of Cal. (In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.)*, 906 F.2d 432, 444-45, 447 n.13 (9th Cir. 1990). But "agreements to exchange pricing data do not themselves constitute a *per se* violation of the Sherman Act." *Id.* at 447 n.13.

Flex also suggests (at 56) that its allegations of information-sharing suffice here because its complaint also sets forth allegations of "bid-rigging." But Flex's allegations of bid rigging involve an entirely distinct conspiracy that was alleged to

have been formed between defendants Murata, TDK, and Taiyo Yuden. Those defendants are not even parties to this appeal.

As the district court explained when it dismissed Flex's third amended complaint, "Plaintiff alleges two distinct types of price-fixing agreements." 5-ER-822. The first alleged conspiracy is "a 'broad directional agreement' between *all Defendants* to fix current and future pricing levels." *Id.* (emphasis added). The second is "a specific price agreement between *the Murata, TDK, and Taiyo Yuden Defendants* to target Original Equipment Manufacturers' ('OEM') supply chains by rigging bids and implementing specific prices." *Id.* (emphasis added). The district court correctly noted that the "distinction between the two conspiracies is important" because the second conspiracy "involved [only] one customer . . . and only three of [the] Defendants . . . and only pertained to specific types of Inductors," 5-ER-823, whereas the first alleged conspiracy was "a larger conspiracy to set the prices of Inductors" globally, 5-ER-828. As the district court found, the bid-rigging allegations concerning the Murata, TDK, and Taiyo Defendants had "nothing to do with the Panasonic, Sumida, and Sagami Defendants." *Id.* Indeed, Flex's allegations regarding the narrower bid-rigging conspiracy involving only the Murata, TDK, and Taiyo Yuden defendants clearly state that such conspiracy involved and benefited *only* those defendants. *See, e.g.*, 5-ER-658 (Fourth Am. Compl. ¶ 243) ("Defendants TDK, Taiyo Yuden, and Murata colluded to maintain

their collective incumbent status with the OEM purchasers that had qualified any one of the three to sell inductors.").

For that reason, the district court properly refused to infer from Flex's bid-rigging allegations against Murata, TDK, and Taiyo Yuden that "the Panasonic, Sumida, and Sagami Defendants were also involved in a [broader] price-fixing conspiracy." 5-ER-828. Flex did not take issue with that determination in its opening brief, and so any challenge to that determination is now waived. *See, e.g.*, *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived."). And that point disposes of the notion that Flex could escape its obligation to present plausible parallel-pricing allegations involving Panasonic, Sagami, and Sumida simply by gesturing at unrelated bid-rigging allegations. To state a claim against Panasonic, Sagami, and Sumida for their purported involvement in a global conspiracy to fix inductor prices, Flex must show that *Panasonic, Sagami, and Sumida* were engaged in such a conspiracy. *See United States Gypsum Co.*, 438 U.S. at 463 (Sherman Act liability may "only be predicated on the knowing involvement of each defendant, considered individually, in the conspiracy charged."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) ("[A]t the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." (citation omitted)).

Thus, Flex's claim cannot survive in the absence of plausible allegations that Panasonic, Sagami, and Sumida were engaged in parallel pricing with respect to inductors. Those allegations do not exist. Flex's misguided attempt to bootstrap its information-exchange allegations as the relevant "parallel conduct" at issue here only underscores just how little confidence Flex has in its allegations regarding parallel pricing. As discussed below, those allegations do not plausibly establish that Panasonic, Sagami, or Sumida engaged in parallel pricing.

### 2. *Flex Did Not Plausibly Allege That Panasonic, Sagami, and Sumida Engaged In Parallel Pricing*

When Flex finally turns to its parallel-pricing allegations, it asserts that the district court erred with respect to those allegations by "deem[ing] Flex's pricing allegations [as] insufficient because: 1) Flex was unable to demonstrate *statistically significant* evidence of parallel pricing as to *all* Defendants; and 2) Flex's price comparisons purportedly did not 'demonstrate trends, patterns, or relationships' among certain Defendants' pricing over time." Flex Br. 58-59 (citation omitted). In Flex's view, "[n]either showing is required." *Id*. at 59. That is incorrect.

On the first point—that the district court treated Flex's parallel-pricing allegations as "insufficient" because Flex did not present "statistically significant" allegations of parallel pricing—Flex simply misreads the district court's opinion. The district court nowhere demanded that Flex provide "statistically significant" evidence of parallel pricing. The district court merely observed that Flex "engaged

41

an expert to demonstrate statistical evidence of parallel pricing," and that such expert "could only demonstrate such pricing among the TDK, Murata, and Taiyo Yuden Defendants." 1-ER-7. The district court did not suggest that Plaintiffs' claim against Panasonic, Sagami, and Sumida failed on that basis; the district court went on to consider Flex's use of "price comparisons" involving the prices charged for inductors by Panasonic, Sagami, and Sumida. 1-ER-7–8. Flex's argument that the district court wrongly required Flex to show "statistically significant" parallel pricing as to all defendants thus rests on a false premise.

That false premise carries over to Flex's second point, which is that the district court erred by "rejecting Flex's price comparisons for being not parallel enough." Flex Br. 61. In Flex's view, the district court's decision rejecting Flex's price comparisons rested "on the misconception that *Musical Instruments* requires statistically precise parallel pricing allegations." *Id.* at 62. But all that the district court held was that allegations of parallel pricing must indicate "trends, patterns, or relationships among the Defendants' pricing over time." 1-ER-8. And in support of that point, the district court rightly cited this Court's decision in *Musical Instruments* for the proposition that parallel conduct refers to competitors' adoption of "*similar* policies around the same time in response to similar market conditions." *Id.* (quoting *Musical Instruments*, 798 F.3d at 1193).

Flex itself appears to recognize that this is the proper pleading standard because it cites a number of cases standing for the incontrovertible position that a plausible allegation of "parallel" conduct requires some showing that the competitors' conduct at a given point in time was generally similar. *See SD3*, 801 F.3d at 427 ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'" (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993))); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 68-69 (D.D.C. 2016) (determining that "Plaintiffs sufficiently pled parallel conduct" where airline executives from different firms made similar statements "close in time" and "[those] statements [reflected] a new trend of limited capacity growth . . . within the industry"); *see also* Flex Br. 61 (citing *SD3*, *Petruzzi's*, and *Domestic Airline Travel*). That makes sense because the whole point of a cartel agreement—here, an alleged price-fixing agreement—is to establish that the parties "will not compete in price," which necessarily entails coordinated pricing conduct in response to market conditions. *In re Text Messaging Antitrust Litig.*, 630 F.3d at 627. Similar conduct with respect to pricing is necessary to show such coordination. Thus, a plaintiff alleging parallel pricing conduct must show that the defendants acted similarly with respect to pricing at equivalent points in time in response to similar market conditions. Flex cannot meet that standard.

Indeed, Flex has conspicuously failed to offer any real argument that Panasonic, Sagami, or Sumida actually charged "similar" prices for inductors during the alleged conspiracy period. That is because Flex can make no such argument: As the district court properly concluded, the price comparisons offered by Flex in its operative complaint did "not show any trends, patterns, or relationships among the Defendants' pricing over time." 1-ER-8 (citing 5-ER-718 (Fourth Am. Compl. ¶ 539)). Most of the parallel-pricing allegations presented by Flex concerned parallel pricing between Murata, TDK, and Taiyo Yuden. *See* 5-ER-714–17 (*id.* ¶¶ 525-34). When it came to the pricing conduct of Panasonic, Sagami, and Sumida, Flex presented only a single table listing a handful of price comparisons that purportedly showed parallel pricing conduct among the defendants before this Court. 5-ER-718 (*id.* ¶ 539).

But Flex's price-comparison table only underscores the threadbare nature of Flex's parallel-pricing allegations with respect to Panasonic, Sagami, and Sumida. For example, Flex includes only a *single* transaction involving Sagami (a September 2007 purchase of wirewound chips), *see id.*, which of course affords no basis to draw an inference regarding the manner in which Sagami's pricing changed over time in parallel with competitors. Likewise, the table lists price comparisons pertaining to entirely distinct inductor products, making it difficult to draw any inferences from the data. *See id.* (listing various price comparisons for six different types of

inductors); *see also supra* 7-8 (prices of different types of inductors vary widely). And even as to those few price comparisons that actually tracked the same product over time, they show the price of inductors moving *down* over time, which hardly supports Flex's claim that defendants were engaged in a conspiracy to raise or stabilize the price of inductors. *See* 5-ER-718 (Fourth Am. Compl. ¶ 539) (showing a decrease in the price charged by Sumida for shielded SMD inductors); *id.* (showing a decrease in the price charged by Panasonic for common mode chokes). The district court's conclusion that these scattered allegations provided scant support for Flex's claim was entirely correct.

Indeed, even though these price comparisons were the centerpiece—really, the only piece—of Flex's parallel-pricing allegations against Panasonic, Sagami, and Sumida, Flex makes no specific reference to them in its brief on appeal. Instead, Flex asserts only generally that Dr. Lamb "identified price comparisons supporting Flex's pricing allegations," Flex Br. 58, and that "Panasonic and Sagami pricing showed very similar trend lines over time for certain popular inductor types and were nearly identical by 2012." *Id.* (citing 5-ER-719 (Fourth Am. Compl. ¶ 545)). But the section of the operative complaint cited by Flex says only that "[f]or Panasonic and Sagami, monthly median prices for certain popular inductors made by each company exhibited very similar trend lines over time." 5-ER-719 (Fourth Am. Compl. ¶ 545). The complaint does not identify what "popular inductors" Flex is

talking about, nor does it explain what "monthly median prices" it is referring to. This allegation is exactly the kind of unsupported, conclusory assertion that is insufficient to support a plausible claim under Rule 12(b)(6). *See Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1177 (9th Cir. 2021) (affirming dismissal where "[t]he complaint failed to answer basic questions").

In short, Flex has utterly failed to defend its core price-comparison allegations, and its argument rebutting the district court's conclusion that those price comparisons "do not demonstrate parallel pricing," 1-ER-8, rests on a plain misreading of the district court's opinion. In addition, Flex's strained argument that it need not even put forward any plausible allegations of parallel pricing in this circumstantial price-fixing case only underscores what its brief implies: Flex has not advanced plausible allegations that Panasonic, Sagami, and Sumida engaged in parallel pricing. And because Flex has not otherwise pleaded allegations "demonstrating that the Panasonic, Sagami, and Sumida Defendants behaved improperly or conspired with the other named Defendants to fix the prices of inductors," it has failed to state a claim. *Id.*

## C. Flex's Remaining Arguments Are Unavailing

Finally, Flex argues briefly that the district court failed to evaluate Flex's complaint "holistically," and wrongly ignored two sets of allegations in Flex's fourth amended complaint. Flex Br. 63 (header). In particular, Flex argues that the district

court should have given greater weight to "market condition allegations" suggesting that the inductor market is particularly susceptible to collusion, Flex Br. 63, and that the district court failed to consider certain allegations specific to Panasonic, *id.* at 65-66. Neither of these last-ditch arguments withstands scrutiny.

### 1. *Flex's Own Allegations Indicate That The Inductor Market Is Dynamic And Competitive*

First, Flex's market-condition allegations do not solve the central problem with Flex's complaint: Flex does not allege parallel conduct, and in the absence of such allegations, its allegations regarding information exchanges at JEITA fail to state a plausible claim of price-fixing. If Flex had presented plausible allegations of parallel pricing among the Panasonic, Sagami, and Sumida defendants, some allegations regarding market concentration could (in theory) help push Flex's claim towards plausibility. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628 (plausible claim where four defendants controlled "90 percent of U.S. text messaging services" *and* defendants allegedly engaged in clear parallel pricing). But, as explained, there are no such plausible parallel-pricing allegations here. *See supra* at 41-46.

In any event, Flex's market-concentration allegations suffer from serious flaws in their own right. In particular, these allegations tend to show that the market for inductors is neither static nor characterized by "high barriers to entry," Flex Br. 64, and that the defendants vigorously compete with one another for market share.

47

As Flex's own allegations illustrate, over the course of the alleged conspiracy, the respective shares of the inductor market controlled by the defendants in the district court changed significantly. Whereas the three defendants who are not before this Court—TDK, Murata, and Taiyo Yuden—controlled 74% of the global market for inductors in 2004 (at the beginning of the alleged conspiracy), that share had shrunk to under 50% in 2016 (at the conclusion of the alleged conspiracy). *See* 5-ER-763 (Fourth Am. Compl. ¶¶ 760-61). Over that time, each of those defendants lost market share. *Id.* At the same time, Sumida's market share more than tripled, from 4% of the global market to 13% of the global market. *Id.*[4]

Unexplained in Flex's operative complaint, or its brief before this Court, is why these alleged conspirators would allow one of their alleged co-conspirators (Sumida) to treble its global market share at its alleged co-conspirators' expense. Where a smaller competitor like Sumida is aggressively *gaining* market share, that fact in itself highlights the implausibility of an allegation of collusion. *See Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 210 (3d Cir. 2017) (Stengel, J., dissenting) ("[A] company acting in a healthy, competitive, and self-interested manner would seek to expand—not maintain or decrease—its own market share.").

---

[4] Over the same time, Panasonic and Sagami remained marginal players, but there is no allegation that either lost market share. *See* 5-ER-763–64 (Fourth Am. Compl. ¶¶ 760-62).

And neither of the other defendants before this Court—Panasonic and Sagami—lost market share during the course of the alleged conspiracy (in contrast to the bid-rigging defendants, who *did* lose market share over the course of the conspiracy, as might be expected of market participants attempting to maintain supra-competitive pricing). *See* 5-ER-763–64 (Fourth Am. Compl. ¶¶ 760-62). Flex's own allegations therefore tend to show that Sumida, Panasonic, and Sagami were *not* participants in a price-fixing conspiracy with Murata, TDK, and Taiyo Yuden.

There are other problems with Flex's characterization of the inductor market. Most notably, Flex's argument (at 64) that there are "high barriers" to entry in that market is belied by its own allegations showing that the global market share given over to "other" companies—that is, firms other than the Japanese corporate families TDK, Murata, Taiyo Yuden, Panasonic, and Sumida—nearly doubled between 2004 and 2016, from 17% to 33%, *see* 5-ER-763 (Fourth Am. Compl. ¶¶ 760-61), and as Flex acknowledges, "[m]any small Chinese inductors manufacturers entered the global inductors market . . . in 2003," 5-ER-765 (*id.* ¶ 772).

Flex recognized in the district court that the successful entry of "[m]any small" Chinese firms into a market supposedly controlled by an oligopolistic cartel presented a serious challenge to its narrative, so it alleged that those Chinese competitors "could not make significant inroads into the market" because their "products were perceived by Flex, Flex's OEM customers, and other large inductor

purchasers as being lower quality." 5-ER-766 (*id.* ¶ 775). In its operative complaint, Flex resorts to quoting blog posts and online message boards corroborating "Flex's [allegedly] dim view of Chinese inductor quality." 5-ER-768 (*id.* ¶ 782); *see also* 5-ER-767 (*id.* ¶¶ 779-80) (quoting an "online electronics forum" and a "blog concerning the best computer mouse to use" regarding the allegedly "inferior nature of inductors made by Chinese manufacturers").

Yet again, however, Flex's own allegations contradict it: as Flex elsewhere shows in its complaint, Flex's purchases of these supposedly "lower quality" Chinese inductors steadily rose over the course of the time period at issue in this case. *See* 5-ER-769 (Fourth Am. Compl. ¶ 790). Indeed, over that period, Flex bought many more inductors from Chinese manufacturers than it bought from Panasonic, Sagami, and Sumida combined. *Compare id.*, *with* 5-ER-764 (Fourth Am. Compl. ¶ 766) (establishing that Flex bought approximately only 1.4% of its inductors during the relevant time period from defendants other than Murata, Taiyo Yuden, and TDK). Flex's effort to downplay the significance of the Chinese manufacturers' entry (and evident success) in the global market for inductors is unpersuasive.

Nor does it help Flex's cause that its expert, Dr. Lamb, "undertook a quantitative analysis," Flex Br. 64, and concluded that the "Chinese inductor manufacturers . . . lacked the scope or capacity to exert pricing discipline," 5-ER-

770 (Fourth Am. Compl. ¶ 792). As Flex's operative complaint makes clear, the "analysis" undertaken by Dr. Lamb was simply to "review[ ] the table" of Flex's Chinese purchases set forth in the complaint. 5-ER-770 (Fourth Am. Compl. ¶ 792). Here, Flex once again wrongly seeks to substitute expert opinion as to legal conclusions in place of well-pleaded factual allegations—an effort that must fail. *See Iqbal*, 556 U.S. at 678; *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (noting that expert testimony is "not a substitute" for "market facts"). The district court correctly declined to address Dr. Lamb's opinion, and correctly declined to assign controlling weight to Flex's flawed allegations regarding the structure of the inductor market.

### 2. *Flex's Panasonic-Specific Arguments Provide No Basis For Reversal*

Finally, Flex argues that the district court erred by failing to "consider new allegations further explaining Panasonic's position in the relevant market." Flex. Br. 65 (header). It complains that the district court noted in its order dismissing Flex's third amended complaint that Panasonic is a "*massive* purchaser[]" of inductors, and only a "marginal producer[]" of inductors, which tended to reduce the plausibility of Panasonic's alleged participation in an inductor price-fixing conspiracy. 5-ER-811 (citation omitted). Flex asserts that the district court's decision on that point was mistaken, since "Flex never alleged that Panasonic was a 'massive purchaser' of inductors," and it further contends that "new allegations" in

the operative complaint "further explain Panasonic's position in the market." Flex. Br. 65-66.

Flex is wrong: It can fairly be inferred from Flex's pleadings that Panasonic is a massive purchaser of inductors, given that inductors are "ubiquitous in thousands of products that rely on electronic circuits for power," 5-ER-645 (Fourth Am. Compl. ¶ 168), and "Panasonic is a household brand," 5-ER-641 (*id.* ¶ 149) (citing *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 402 F. Supp. 262, 310 (E.D. Pa. 1975)), that manufactures and sells a wide range of household electronics products, *see Zenith Radio*, 402 F. Supp. at 279, 310. And Flex itself alleged that Panasonic is a relatively small seller of inductors, with only 5% of the global sales market, *see* 5-ER-763 (Fourth Am. Compl. ¶ 761), amounting to only $130 million of yearly sales revenue, *see* 5-ER-623 (*id.* ¶ 69)—just a tiny fraction of Panasonic's overall $62 billion in yearly sales of its electronics products overall, *see* 5-ER-773 (*id.* ¶ 815). Indeed, Panasonic's overall yearly sales dwarf those of Flex, *see* 5-ER-651 (*id.* ¶ 194) (alleging that Flex has $24.2 billion in sales per year), which alleges that it has spent over $750 million on inductors, *see* 5-ER-652 (*id.* ¶ 199). In light of Flex's own allegations, the district court did not err in noting that Panasonic's interest in inductors as a *buyer* is likely at least as significant as its interest in inductors as a *seller*. *See* 5-ER-811 (noting that the class plaintiffs "failed to allege

sufficient facts to show why it was plausible for Panasonic to facilitate a cartel in a market where it purchases more product than it sells").

More to the point, however, Flex has not shown why the district court's alleged error mattered here: the district court's observation that Panasonic is probably a net buyer of inductors came in the background section of its order dismissing Flex's third amended complaint. *Id.* None of the district court's analysis with respect to Flex's complaint turned on that observation. Instead, the district court dismissed Flex's third amended complaint because that complaint "failed to allege parallel conduct," and otherwise failed to allege sufficient "circumstantial evidence of a conspiracy among the Defendants to fix the prices of Inductors." 5-ER-832–33. The district court dismissed Flex's fourth amended complaint for the same reasons. *See* 1-ER-7–8. Those problems would remain regardless of the district court's understanding of Panasonic's "position in the market," Flex Br. 65, and Flex cannot possibly present an argument for why this issue would merit reversal (even assuming there were any error on the district court's part), or why a "holistic" evaluation of Panasonic's position in the market would make up for the fact that Flex failed to plausibly plead parallel conduct and otherwise failed to establish any "plus factors" other than the JEITA information exchanges on which its case hinges. Flex's argument on this front is unavailing.

\*   \*   \*

At the end of the day, it is clear that Flex's case against Panasonic, Sagami, and Sumida rests entirely on its allegations that those defendants attended industry trade association meetings at which information was exchanged among inductor manufacturers. It is equally clear—as a matter of Ninth Circuit law—that such allegations are not sufficient to sustain a price-fixing claim under Section 1 of the Sherman Act. *See Musical Instruments*, 798 F.3d at 1196. The district court afforded Flex multiple opportunities to build out its price-fixing claim against Panasonic, Sagami, and Sumida through plausible, cognizable allegations of parallel pricing and other plus factors. But Flex simply failed to do so. The district court's decision dismissing Flex's complaint for failure to state a claim against Panasonic, Sagami, and Sumida was therefore entirely warranted.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  September 12, 2022

Respectfully submitted,

_s/ Gregory G. Garre_

Gregory G. Garre*
    *Counsel of Record*
Marguerite M. Sullivan
Allyson M. Maltas
Charles S. Dameron
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com

Alfred C. Pfeiffer, Jr.
Elizabeth C. Gettinger
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

\* *I certify that all parties listed concur with the filing of this brief.*

*Counsel for Defendants-Appellees Sumida Corporation, Sumida Electric Co., Ltd.*, *and Sumida America Components, Inc.*

Cynthia E. Richman
Amalia Reiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

_s/ Daniel G. Swanson_

Daniel Glen Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
dswanson@gibsondunn.com

Eli M. Lazarus
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel for Defendants-Appellees Panasonic Holdings Corporation f/k/a Panasonic Corporation and Panasonic Corporation of North America*

*s/ J. Maxwell Cooper*

J. Maxwell Cooper
Jason M. Allen
KESSENICK GAMMA LLP
1 Post Street
Suite 2500
San Francisco, CA 94104
(415) 362-9400
mcooper@kgf-lawfirm.com

*Counsel for Defendants-Appellees Sagami Elec Co., Ltd.,
and Sagami America Ltd.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** _22-15231_

I am an attorney for Defendants-Appellees Sumida Corporation, Sumida Electric Co., Ltd., and Sumida America Components, Inc.

This brief contains 12,530 words, excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs; or
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/ Gregory G. Garre_          **Date** _September 12, 2022_